839 A.2d 942 (2003)
365 N.J. Super. 520
DEBRA F. FINK, D.M.D., MS, PC and Joel Fink, on Behalf of Themselves and All Others Similarly Situated Plaintiff,
v.
RICOH CORPORATION, Defendant.
Superior Court of New Jersey, Law Division, Essex County.
Decided July 31, 2003.
*948 Michael E. Gogal, Passaic, (Epstein, Fitzsimmons, Brown, Ringle Gioia Jacobs), and Seth R. Lesser, and Jeffery A. Klafter (Messrs: Bernstein, Litowitz, Berger, Grossmann), for plaintiffs.
John T. Dolan, Newark, Michael Mc-Donald and Lan Hoang (Gibbons, Del Deo, Dolan, Griffinger & Vecchione), for defendant. *943 *944 *945 *946
*947 SCHWARTZ, J.S.C.
I. Introduction
This is a motion for certification of a nationwide class consisting of all purchasers of the Ricoh model RDC-1 digital camera. The plaintiffs, Joel Fink ("Fink") and Debra F. Fink, D.M.D., MS, P.C., (jointly referred to as "plaintiffs") allege violations of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to N.J.S.A. 56:8-21, ("the NJCFA") by defendant Ricoh Corporation ("Ricoh"). Plaintiffs assert that the entire *949 class has suffered economic damages as a result of an allegedly false and misleading nationwide advertising campaign promulgated by Ricoh. Plaintiffs seek relief in the form of "threefold the damages sustained by any person in interest", as well as "reasonable attorneys' fees, filing fees and reasonable costs of suit," pursuant to N.J.S.A. 56:8-19.
II. Factual and Procedural Background
On December 27, 1996 plaintiff Fink purchased the model RDC-1 camera primarily for the use of his wife, Debra F. Fink, D.M.D., MS, P.C., in her orthodontic dental practice. He paid $1,585.52 for the camera. The camera was obtained from an independent third party distributor, Egghead Software ("Egghead"), located in Lancaster, Pennsylvania. Fink bought the camera after reviewing a marketing pamphlet disseminated by Ricoh in a store in St Louis, Missouri, the city in which plaintiffs reside. On the pamphlet, many of the camera's features were represented and described. This pamphlet and other similar advertising materials, were disseminated across the United States for the purpose of marketing the model RDC-1 digital camera.
After attempting to use some of the advertised features of the camera described below and failing, plaintiffs filed a complaint with this court seeking redress of their grievances under the NJCFA. Plaintiffs contend that all of Ricoh's promotional materials relating to the RDC-1 camera, including the box in which the camera was packaged for distribution, contain false and misleading representations as well as material factual omissions. Among plaintiffs' complaints are allegations that
1. Ricoh falsely and deceptively advertised that the RDC-1 camera could record "full motion video," whereas the RDC-1 model camera produces full motion video that appears distorted when viewed at recorded resolution. Plaintiffs assert that in order to produce full motion video the screen display must be reduced by 92% (approximately 3 inches by 2 inches) for adequate resolution on a computer. In this regard plaintiffs further allege that the RDC-1 camera focuses and adjusts exposure automatically only in the first frame of the video produced by the RDC-1 model camera and that the camera does not change focus or exposure settings throughout the remaining 299 frames of the video.
2. Ricoh falsely and deceptively advertised that its model RDC-1 camera could transmit full motion video via modem. In fact, plaintiffs assert that the model RDC-1 camera cannot transmit full motion video via modem or digital cellular phone because the separate proprietary adapter sold by Ricoh for that purpose cannot transmit in "video mode."
3. Ricoh falsely and deceptively advertised that the model RDC-1 camera auto-focuses and has a shooting range of one centimeter to infinity. In fact, plaintiffs claim that the RDC-1 model camera cannot auto focus at a range of less than sixteen inches. In addition, plaintiffs contend that the model RDC-1 camera cannot manually focus at less than sixteen inches unless a separate Ricoh LCD monitor is purchased at a price of $500 and is used, or unless the RDC-1 model camera is connected to a television to which it has to remain tethered.
4. Ricoh falsely and deceptively advertised that the RDC-1 model camera *950 had automatic white balance for all of its modes of recording. In fact, plaintiffs assert that the model RDC-1 cameras cannot perform automatic white balance for full motion video and cannot provide continuous images after the first image in those sequences in which it is recorded.
5. Ricoh falsely and deceptively advertised that the RDC-1 model camera can delete full motion video instantly. In fact, plaintiffs claim that all RDC-1 model cameras cannot delete full motion video instantly. According to plaintiffs the RDC-1 model camera requires 81 seconds to delete full motion video recorded in normal mode. Moreover, plaintiffs contend that the RDC-1 model camera cannot be used during this 81 second time period.
6. Ricoh falsely and deceptively advertised that the RDC-1's data could be easily accessed by computers running Windows and Macintosh operating systems. In fact, plaintiffs allege that the model RDC-1 camera cannot transfer full motion video to a computer. Moreover, according to plaintiffs the RDC-1 model camera requires that the customer purchase a separate device, such as a PC Card reader, that enables the computer to read the RDC-1's JEIDA PC Card, which is Ricoh's memory card.
7. Ricoh falsely and deceptively advertised that the RDC-1 model camera can output to "any color PC and video printer." In fact, plaintiffs allege that during the period that the RDC-1 model camera was sold, very few color printers on the market had the cable connection devices necessary to receive images from the RDC-1 model camera through a direct cable hookup.
8. Plaintiffs allege that Ricoh concealed from prospective purchasers important data needed by such purchasers by omitting disclosure of the need to obtain the necessary transmitting and transferring function decals that had to be affixed to the camera after it was purchased, thereby giving a false impression of the ease of its use. Plaintiffs assert that all RDC-1 model digital cameras perform five separate transmitting and transferring functions, and Ricoh provides instructions for these functions based upon unadvertised decals that must be affixed alongside the advertised control buttons on the body of the Ricoh RDC-1 model camera. In its manuals, Ricoh gives what plaintiffs contend are exceptionally complex and confusing instructions for when a control button is performing the advertised function and when the same control button is performing a different unadvertised function in each of the five separate modes.
The claim of concealment summarized in paragraph 8 above which is asserted in plaintiffs' brief is also asserted in plaintiffs' complaint. In addition to that claim of concealment, plaintiffs' complaint details two other claims of concealment of material facts. The complaint alleges the following:
16. * * *
(4) Ricoh's advertising and marketing materials deceptively failed to disclose limitations on using the camera's features, such as the facts:
(a) that, despite the camera being portrayed as permitting camera output to "any color PC and video printer" and "printers", the only printers that could receive images from the camera had to have an AV cable or an S-Video cable *951 connection, capabilities few printers possess,
(b) that, despite the RDC-1's "data" as supposedly being "easily accessed by computers running Windows and Macintosh platforms", the RDC-1 camera cannot transfer full frame motion video to a computer that did not have a device to read a JEIDA PC card (most of which did not have such a device during the relevant period).
The above claims of fraudulent concealment are detailed in plaintiffs' brief as claims of affirmative misrepresentation which are summarized above on pages 4 and 5, paragraphs 7 and 6 respectively, of this opinion.
The other claims of material affirmative misrepresentations alleged in plaintiffs' initial brief in support of their motion for class certification at pages 47 which are summarized above at pages 3 and 4, paragraphs 1 through 5, may also be found, although in somewhat less detail and in a different format in plaintiffs' Complaint, pages 47, paragraphs 12 through 15, 16(2) and 16(3).
Plaintiffs read the marketing pamphlet they obtained at a retail outlet in St Louis, Missouri where they reside. They are the only class members represented in this action. Ricoh's United States corporate headquarters is located in West Caldwell, New Jersey. Plaintiffs wish to pursue a nationwide class action against Ricoh representing all United States purchasers of the camera. They assert that the NJCFA should be applied as the law controlling the rights of all nationwide class members against Ricoh primarily because New Jersey is its principal place of business.
In order to prevail under the NJCFA, assuming, based on a conflict of laws analysis, that that statute were held applicable across a nationwide class, a private plaintiff must demonstrate an "ascertainable loss of moneys or property, real or personal," as result of conduct rendered unlawful under the statute. N.J.S.A. 56:8-19. The plaintiffs assert that all class members, as a result of the marketing activities of Ricoh, suffered an ascertainable loss. In this regard plaintiffs claim that the price of the RDC-1 camera was artificially inflated by an increase in the product's demand based on the marketing campaign of Ricoh. The difference between the price that was charged and the price that should have been charged ("the price inflation theory") is the asserted ascertainable loss which plaintiffs allege was incurred by all class members. The plaintiffs thus maintain that all purchasers of the camera were harmed, regardless of whether they saw or were caused to purchase an RDC-1 camera by the alleged misrepresentations or factual concealments contained in the advertisements in question.
N.J.S.A. 56:8-2, which declares deceptive or fraudulent commercial advertising practices unlawful, provides as follows:
The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; provided, however, that nothing herein contained shall apply to the owner or publisher of newspapers, magazines, publications or printed matter wherein such advertisement appears, or to the owner or operator of a radio or television station which *952 disseminates such advertisement when the owner, publisher, or operator has no knowledge of the intent, design or purpose of the advertiser.
The efficacy of plaintiff's price inflation theory is governed by whether it falls within the requirements of N.J.S.A. 56:8-19, which provides:
Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented may bring any action or assert a counterclaim therefore in any court of competent jurisdiction. In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, including those brought by the Attorney General, the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit.
The validity of the price inflation theory and that theory's ramifications on the efficacy of plaintiffs' request for class certification are explored in detail below.
III. Motion for Class Certification
The plaintiffs seek certification of the following nationwide class:
"All United States purchasers of Ricoh's RDC-1 digital camera. Excluded from the class is defendant, any entity in which defendant has controlling interest, and any of its subsidiaries, affiliates, and officers and directors."
R. 4:32-1(a) establishes the following requirements for class action certification:
(a) General Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
In addition, the class must meet the following guidelines set forth in R. 4:32 1(b)(3):
(b) Class Action Maintainable. An action may be maintained as a class action if the prerequisites of paragraph (a) are satisfied, and in addition:

* * * * * *
(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The factors pertinent to the findings include: first, the interest of members of the class in individually controlling the prosecution or defense of separate actions; second, the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; third, the difficulties likely to be encountered in the management of a class action.
In consumer fraud cases the class action mode of adjudication is particularly appropriate. In re Cadillac V8-6-4 Class Action, 93 N.J. 412, 435, 461 A.2d 736 (1983) (hereinafter "In re Cadillac"). New Jersey courts, as well as federal courts construing the federal class action rule after which our rule is modeled, have consistently held that the class action rule should be liberally construed in a case *953 involving allegations of consumer fraud. Ibid; Delgozzo v. Kenny, 266 N.J.Super. 169, 179, 628 A.2d 1080, (App.Div.1993). Our Supreme Court has observed that: "... a court should be slow to hold that a suit [involving a claim of consumer fraud] may not proceed as a class action." Riley v. New Rapids Carpet Ctr., 61 N.J. 218, 228, 294 A.2d 7 (1972).
The purposes of a class action are clear. First, class action suits afford a means of redress for consumers with claims too small to merit the risk and expense of individual prosecution against large corporations. One frequent characteristic of a consumer class action is that the individual claims involve too small an amount to warrant recourse to litigation. Thus, the wrongs would go without redress, and the manufacturer may continue with impunity to place defective or falsely advertised products on the market. In re Cadillac supra, at 435, 461 A.2d 736; Riley v. New Rapids Carpet Center, supra, at 225, 294 A.2d 7. Certification of a class-action achieves the goal of equalizing the ability of claimants "to prepare and pay for the advocacy of their rights." In re Cadillac, supra, at 435, 461 A.2d 736. In addition to the reasons stated above, the threat of a class action functions as a deterrent to companies in terms of all their business practices. In Riley the Supreme Court echoed this point when it stated:
"The reputable vendor, too, has a stake in the suppression of dishonest competition. If each victim were remitted to an individual suit, the remedy could be illusory, for the individual loss may be too small to warrant a suit or the victim too disadvantaged to seek relief. Thus the wrongs would go without redress, and there would be no deterrence to further aggressions." [Id. at 225, 294 A.2d 7].
Based on the assessment of the facts and applicable law pertaining to class certification, and despite judicial preference for class action litigation of consumer fraud claims, this court denies certification of a nationwide class action against Ricoh for the reasons set forth in detail below.
A. Price Inflation Theory
Requisite to an evaluation of the specific requirements of R.32-1 the merits of the price inflation theory of damages posited by plaintiffs must first be assessed since, absent acceptance of such theory, plaintiffs have failed to state a cause of action under the NJCFA. As stated previously, the NJCFA provides for relief to individual claimants when there is an "... ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act." N.J.S.A. 56:8-19. The above statutory provision requires that there must be an "ascertainable loss" that comes about "as a result of the fraudulent act. At the current juncture of this class action suit two questions beg answers:(1) Can the necessary damages be established under the price inflation theory? (2) If damages may be established under that theory, can the requirement of causation be met across the entire class?
In rendering a decision in a class action certification, the role of the court is not to rule on the plausibility of the allegations. Questions of fact are to be resolved by a jury at trial. The Appellate Division in Delgozzo recognized this distinction when it held:
When determining whether a class should be certified, a court is not to make a preliminary determination of the merits of the underlying claims. "The court is bound to take the substantive allegations of the complaint as true, thus necessarily making the class order speculative in the sense that the plaintiff *954 may be altogether unable to prove his allegations." [Id., 266 N.J.Super. at 180-181, 628 A.2d 1080].
Although class certification may not be denied based on the factual merits of a complaint, some preliminary analysis of the legal theory on which the action is based is required In re Cadillac, supra, at 426, 461 A.2d 736. see also, Olive v. Graceland Sales Corp., 61 N.J. 182, 189, 293 A.2d 658, (1972) (where the Court observed: "Ordinarily, the merits of a complaint are not involved in a determination as to whether a class action may be maintained unless of course the allegations are patently frivolous.")
While not bound by the interpretations given the federal class-action rule, New Jersey courts, when construing its class action rule, "...have consistently looked to the interpretations given the federal counterpart for guidance" Delgozzo v. Kenny, supra, at 188, 628 A.2d 1080. Thus, in order to determine whether the requirements for class action certification have been met, the Fifth Circuit held that inquiry beyond the pleadings must be made because "the court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." Castano v. American Tobacco Co., 84 F.3d 734, 744 (5th Cir.1996); accord, Carroll v. Cellco Partnership, 313 N.J.Super. 488, 495, 713 A.2d 509 (App. Div.1998) (quoting Castano).
Although the NJCFA contains provisions "allowing individual consumers to recover refunds for losses caused by violations of the Act, N.J.S.A. 56:8-2 to2.12," Weinberg v. Sprint Corp., 173 N.J. 233, 249, 801 A.2d 281 (2002), the court held that "[t]he express language of the statute requires a private party to have a claim that he or she has suffered an ascertainable loss of moneys or property in order to bring a cause of action under the Act." Id. at 250, 801 A.2d 281. The Weinberg complaint was dismissed because plaintiff and the class members suffered no ascertainable loss under the filed rate doctrine. That doctrine precludes any award of damages when, as in Weinberg, defendant's charges conformed with its published tariff even when "the damage claims are premised on state contract principles, consumer fraud or other bases on which plaintiffs seek to enforce a rate other than the filed rate" Id. at 243, 801 A.2d 281 (citing Marcus v. AT & T Corp., 138 F.3d 46, 51, 60-61 (2nd Cir.1998)). The court rejected plaintiff's argument, based on lack of proofs, that he suffered an ascertainable loss because he could have purchased a subminute cell phone service, rather than the one he purchased from defendant which rounded up to the next nearest whole minute. Id. at 238-239, 801 A.2d 281.
Similarly, although finding a clear violation of the NJCFA, the court in Cannon v. Cherry Hill Toyota, Inc., 161 F.Supp.2d 362, 373-375 (D.N.J.2001) granted defendant's motion for partial summary judgment and struck plaintiff's demand for damages under the act, reasoning as follows:
New Jersey's courts have interpreted the NJCFA as requiring a causal link between the practice and the harm. The New Jersey Supreme Court has stated that in order to recover damages under NJCFA, a plaintiff must "prove that the unlawful consumer fraud caused his loss." Cox v. Sears Roebuck & Co., 138 N.J. 2, 23, 647 A.2d 454, (1994). Even though a plaintiff need not actually expend a sum of money as a result of defendant's unlawful consumer practice in order to demonstrate a loss, the loss still must be established with a reasonable degree of certainty. Id. at 22, 647 *955 A.2d 454, There must be a causal relationship between the ascertainable loss and the unlawful practice. Roberts v. Cowgill, 316 N.J.Super. 33, 41, 719 A.2d 668, (App.Div. 1998).

* * * * * *
Cherry Hill's failure to disclose the true price of the service contractthe amount actually remitted to Interstate is as a matter of law a violation of the NJCFA, N.J.S.A. 56:8-67, for failure to disclose a material term of the service contract, namely, its actual price.
However, simply showing a violation of NJCFA is not enough to entitle a plaintiff to damages under that Act. It is important to note that the NJCFA does not provide for recovery of statutory damages where a plaintiff cannot show actual harm... NJCFA requires that, in order to recover any damages, a plaintiff must show that she has suffered an ascertainable loss as a result of the defendant's unlawful commercial practice. See, N.J.S.A. 56:8-19.

* * * * * *
In this case, although the defendant has violated NJCFA by failing to state completely the price terms of the MBP warranty, the plaintiff has failed to adduce any evidence tending to show that she suffered an ascertainable loss as a result of defendant's misrepresentation. As the Court noted in connection with the TILA claim, plaintiff has failed her burden of marshaling facts showing that (1) she would have sought a cheaper warranty; and (2) that she would have succeeded in her quest. Plaintiff thus has failed to create a triable issue that she suffered an ascertainable loss as a result of Cherry Hill's NJCFA violation, and plaintiffs demand for damages under the Act will be stricken.
The conclusion reached in Cannon resulted from the plaintiff's inability to demonstrate an ascertainable loss to reasonable degree of certainty. Similarly, this court must assess whether or not plaintiffs can prove to a reasonable degree of certainty an "ascertainable loss" under the price inflation theory which they have advanced on behalf of themselves and the putative nationwide class.
Several New Jersey courts have interpreted the requirement for proof of causation contained in N.J.S.A. 56:8-19. Unlike other states that require plaintiff to prove reliance under their consumer protection statutes,[1] the proof requirements that the New Jersey statute places on its claimants is less burdensome. "The causes of action differ, however, in that common law fraud requires proof of reliance while consumer fraud requires only proof of a causal nexus between the concealment of the material fact and the loss." Gennari v. Weichert Co. Realtors, 148 N.J. 582, 607-608, 691 A.2d 350, (1997). In Varacallo v. Massachusetts Mut. Life Ins. Co., 332 N.J.Super. 31,43, 752 A.2d 807, (App.Div.2000) the court interpreted the decision in Gennari to hold that, "... reliance is not required in suits under the Consumer Fraud Act because liability results from `misrepresentations whether `any person has in fact been misled, deceived *956 or damaged thereby'"` (quoting N.J.S.A. 56:8-2). The "causal nexus" referred to in Gennari is one of proximate cause. Varacallo explains that: "Plaintiffs are required to prove only that defendant's conduct was a cause of damages. They need not prove that Mass Mutual's conduct was the sole cause of loss." Id. at 48, 752 A.2d 807.
Accordingly, the price inflation theory must be evaluated under the guidelines set forth in Gennari, Weinberg, Varacallo and Cannon.
In two reported opinions, the Supreme Courts of Illinois and Pennsylvania have rendered decisions which concern the validity of the price inflation theory under the consumer fraud statutes of those states. In Oliveira v. Amoco Oil Co., 201 Ill.2d 134, 776 N.E.2d 151 (2002) and Weinberg v. Sun Co., Inc. 565 Pa. 612, 777 A.2d 442 (2001) gasoline consumers brought class action lawsuits against large oil companies. In both cases, the theory of price inflation was put forward as the damage claim. The plaintiffs in both cases depended upon the report of an industry expert, University of Delaware economics professor, Dr. William R. Latham, III. The report by Latham in each case asserted that there was a connection between the marketing efforts of the gas companies to the effect that the premium gas advertised would enhance engine performance and provide environmental benefit, and the demand for the gasoline advertised. The econometric analysis made by Professor Latham was articulated in his opinion that an increase in the price of the advertised premium gasoline arose as a result of a heightened demand for the product produced by the defendant's false advertising claims.
The class action representatives in both the Illinois and Pennsylvania consumer fraud suits argued that the absence of their individual exposure to the advertisements should not be pertinent to the court's decision in light of the alleged effect of the false advertising on the price of defendant's premium gasoline products. Regardless of the influence, if any, the defendant's advertisements had on consumer decisions to purchase defendant's premium gasoline, plaintiffs argued that a higher price was exacted as a result of the effect the advertisements had on the marketplace.
While the reasoning of each of the court's opinions in the two cases differed to some extent, the end results were very much the same. The Supreme Courts of Illinois and Pennsylvania each held that certification of the proposed classes was not warranted. In each case, the validity of the price inflation theory on the damage claims was questioned. Both courts ruled that plaintiffs failed to establish the required causation element. As a result, class action certification was either denied (Weinberg) or the underlying action of the class representative was dismissed for failure to state a claim because, based on the evidence, plaintiff could neither plead nor prove proximate cause, thereby rendering the class action question moot (Oliveira).
Weinberg denied class certification on the grounds that plaintiff failed to satisfy the Pennsylvania standards for class certification which are comparable to those mandated in New Jersey by 4:32-1. Specifically, the Pennsylvania Supreme Court in Weinberg held that plaintiffs failed to meet the requirements for numerosity, commonality and predominance. The Weinberg court reasoned:
There is no authority which would permit a private plaintiff to pursue an advertiser because an advertisement might deceive members of the audience and might influence a purchasing decision when the plaintiff himself was neither *957 deceived nor influenced. There is certainly nothing in the statute which suggests such a private right. The UTPCPL was enacted in 1968, and a private cause of action was added in 1976. The UT PCPL's "underlying foundation is fraud prevention." Commonwealth v. Monumental Properties, Inc., 459 Pa. 450, 329 A.2d 812, 816 (1974). Nothing in the legislative history suggests that the legislature ever intended the statutory language directed against consumer fraud to do away with the traditional common law elements of reliance and causation.
The statute clearly requires, in a private action, that a plaintiff suffer an ascertainable loss as a result of the defendant's prohibited action. That means, in this case a plaintiff must allege reliance, that he purchased Ultra® because he heard and believed Sunoco's false advertising that Ultra® would enhance engine performance. In addition, the statute requires him to allege that he purchased the gasoline for personal or household purposes as opposed to business purposes, that he drove a vehicle whose engine would not benefit from the high octane of Ultra®, as well as the amount he purchased in order to establish the amount of his ascertainable loss. The questions of fact applicable to each individual private plaintiff would thus be numerous and extensive. It cannot be said that the trial court erred in concluding that individual questions of fact would predominate over common issues of fact and law and concluding that the certification requirements of commonality and numerosity were not met. [777 A.2d at 446]
The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") was interpreted in Weinberg as requiring proof of reliance, an element of proof not required under the NJCFA. Gennari v. Weichert Co. Realtors, supra., 148 N.J. at 607-608, 691 A.2d 350.
Section 201-9.2(a) of the UTPCPL provides as follows:
Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.
With the exception of the additional provisions in the Pennsylvania statute for a minimum damage award of $100.00 for a violation of the UTPCPL, the latter statute's provision limiting damages for violations to purchasers and lessees of goods and services for personal, family or household purposes, the discretionary nature of the treble damages and attorney's fee provisions in the Pennsylvania statute and the differences in the treatment of concealment of material facts in N.J.S.A. 56:8-19 not contained in the Pennsylvania statute, the wording of Section 201-9.2(a) of the UTPCPL and N.J.S.A. 56:8-19 are otherwise the same in all material respects.
Despite the obvious difference in interpretation given similarly worded consumer fraud statutes by the highest courts of Pennsylvania and New Jersey, it is evident that the price inflation theory of damages was rejected by the Weinberg court in that *958 case. In reinstating the trial court's ruling and reversing that of the Superior Court, (Pennsylvania's intermediate appellate court), the Weinberg court sustained the reasoning of the trial court, which it summarized as follows:
The court denied class certification, holding that the requirements of numerosity and common questions were not met and that individual questions of fact predominated. The basis of the decision was the court's interpretation that the UTPCPL section permitting a private right of action, 73 P.S. § 201-9.2, requires individual proof of ascertainable loss as a result of any conduct prohibited by the law. The court rejected the proof offered through the testimony of appellees' expert witness, Dr. Latham, who expounded the theory that appellants' false marketing campaign increased the demand of Ultra® gasoline, raising the purchase price for all consumers. The trial court viewed each of the counts of the complaint as sounding in fraud. Under the common law, fraud-based claims required proof of reliance and causation. The court therefore defined the universe of plaintiffs to include only consumers who believed the false message that Ultra® would enhance engine performance and purchased Ultra® for that reason. The court accepted the approach of appellants' expert Dr. Wind, which would exclude consumers who did not claim to have been deceived by appellant's advertising but purchased the product for other reasons such as brand loyalty, convenience, perception of quality, or as a reflection of social status. Following this approach, the trial court held that the requirement of numerosity was not established, that individual issues predominated, and that the case was not appropriate for disposition as a class action. [Id., 777 A.2d at 444]
The Weinberg court concluded that because of the need for each class action plaintiff to prove both reliance and causation, individual questions of fact predominated over common questions of law and fact and, accordingly, that plaintiffs had failed to satisfy the class action certification requirements of numerosity, commonality and predominance.
While reliance need not be proven under the NJCFA, plaintiffs must nevertheless demonstrate that each class member read one or more of the advertisements upon which plaintiffs rely and that one or more of the false advertising and material factual concealments which they allege were contained therein constituted a proximate cause of "an ascertainable loss" of money or property. Thus, the causation prong of the proof requirements under the Pensylvania consumer fraud statute which led to denial of class certification in Weinberg must also be satisfied under the New Jersey statute.
Unlike the Weinberg holding which imposed upon plaintiff the added burden to prove reliance to establish a cause of action under the UTPCPL, the Illinois Supreme Court's holding in Oliveira falls more closely in line with the judicial interpretation of the NJCFA. The Consumer Fraud and Deceptive Business Practices Act of Illinois contains the same language as that in the NJCFA, providing a remedy for: "... any person who suffers damage as a result of the violation of the act..." IL 815 § 505/10 (emphasis added). The Illinois Supreme Court held that: "Proximate causation was a necessary element of plaintiff's complaint because his claim for consumer fraud was brought under section 10a(a) of the Act, the provision of the Act which establishes the right to pursue a private cause of action for consumer fraud." Oliveira v. Amoco Oil Co., supra., 776 N.E.2d at 155. Oliveira based its *959 holding on the ruling of the Illinois Supreme Court in the Zekman case where the court held: "The `as a result of language in section 10a(a) imposes an obligation upon a private individual seeking actual damages under the Act to demonstrate that the fraud complained of proximately caused those damages in order to recover for his injury." Zekman v. Direct American Marketers, Inc., 182 Ill.2d 359, 231 IlI.Dec. 80, 695 N.E.2d 853 (1998).
Since the Illinois criterion as to proximate causation is the same as that established by the courts of New Jersey, this court finds the rationale of the Oliveira opinion to be persuasive. The Illinois Supreme Court concluded that in order for the injured party to allege proximate cause, the plaintiff must have been deceived by the advertisements in question. While the Illinois court held that the advertisements did not have to be the sole determinant in causing the purchase, "... to properly plead the element of proximate causation in a private cause of action for deceptive advertising brought under the Act, a plaintiff must allege that he was in some manner deceived." Oliveira v. Amoco Oil Co., supra, 776 N.E.2d at 164. The court in Oliveira dismissed plaintiff's complaint on the ground that "proximate causation was not adequately pled" Id., 776 N.E.2d at 164.
The Oliveira court also rejected the market theory of causation (which this court concludes is identical to the "price inflation theory") holding as follows:
Under plaintiff's "market theory" of causation, purchasers of defendant's premium gasoline who saw the ads but never believed them, i.e. those who "knew the truth," nevertheless have valid claims under section 10a(a) of the Act. Moreover, purchasers of defendant's premium gasoline who never saw the ads and, thus, were "not deceived" also have valid claims. These results are plainly at odds with Zekman.
Zekman makes clear that, to properly plead the element of proximate causation in a private cause of action for deceptive advertising brought under the Act, a plaintiff must allege that he was, in some manner, deceived. Contrary to these principles, plaintiff's amended class action complaint fails to allege that plaintiff was deceived by defendant's advertisement. Accordingly, we reverse the judgment of the appellate court and affirm the circuit court's dismissal of plaintiff's amended class action complaint. [Id., 776 N.E.2d at 164]
This court agrees with the reasoning developed by the Illinois Supreme Court as to the ramifications of the price inflation theory. It must be noted, however, that the facts of the Oliveira case and this case are not the same. The plaintiffs in Oliveira did not themselves claim to have been influenced to purchase Amoco's premium gasoline by the marketing campaign of Amoco Oil Co. In the case at bar, Fink testified to having read and been influenced by a promotional pamphlet concerning the Ricoh model RDC-1 digital camera in purchasing that camera primarily for use by his wife, in her orthodenture practice. As for Fink, there is an apparent causal connection between the alleged fraud and any damages he is able to demonstrate.
Plaintiffs very well may have an individual cause of action against Ricoh assuming their claim is governed by the NJCFA. What is being requested, however, is certification of a class action. Unlike the named plaintiffs in this action, there is no proof that all or even a substantial number of United States purchasers of the Ricoh model RDC-1 digital camera had read and interpreted the Ricoh advertisements in a manner similar to that of plaintiffs in this *960 case or that their purchases were caused to any extent by Ricoh's allegedly false representations or concealments of material facts. To the contrary, plaintiffs allege, as did the plaintiffs in Oliveira, that there are purchasers of the RDC-1 model camera who sustained an "ascertainable loss," based on their price inflation theory, regardless of whether or not such proposed class members read or were deceived by Ricoh's allegedly fraudulent promotional claims. (Pb 19; Prb 24).[2]
Indeed, the "price inflation theory" as advanced by plaintiffs seems to represent circular reasoning. On the one hand, plaintiffs contend that the misrepresentations enabled defendant to increase its price for the camera. On the other hand, plaintiffs assert they need not prove that any prospective class member read the alleged misrepresentations and was caused thereby to purchase the camera. If in fact no one read and was caused by such misrepresentations to buy the camera, how would such fraud cause any price increase in the camera?
Plaintiffs in this case attempt to circumvent this void in their proofs by relying on the following statement by the Varacallo court to assert that when a material omission is alleged, as here, reliance is presumed across the class, and that causation may also be presumed.
If plaintiffs succeed in proving that Mass Mutual withheld material information with the intent that consumers would rely on it in purchasing Mass Mutual's policy, the purchase of the policy by a person who was shown the literature would be sufficient to establish prima facie proof of causation.
Where the theory of recovery is common law fraud, in which reliance is required, our analysis of the predominance issue requires resolution of this question: For purposes of certifying a class, must the plaintiffs offer direct proof that the entire class relied on defendant's representation that omitted material facts, where the plaintiffs have established that the defendant withheld these material facts for the purpose of inducing the very action the plaintiffs pursued? We think not.

* * * * * *
Accordingly, we hold that if the plaintiffs in this case establish the core issue of liability, they will be entitled to a presumption of reliance and/or causation. The presumption shall be governed by the operation of N.J.R.E. 301. See, e.g., Sharpe v. Bestop Inc., 314 N.J.Super. 54, 713 A.2d 1079 (App.Div. 1998), aff'd, 158 N.J. 329, 730 A.2d 285, (1999). [Id. at 752 A.2d 807.]
The Sharpe case, upon which the Varacallo court relies to support the heeding presumption to assist plaintiffs and class members to prove reliance and proximate cause, does not appear applicable to prove proximate cause under the facts of either Varacallo or this case. Neither this case nor Varacallo involve application of safety procedures in a product liability case, the factual underpinning supporting application of the heeding presumption in Sharpe.
The presumption relied upon in Sharpe is based upon the likelihood that a person in the habit of complying with safety instructions in the use of a product is entitled to an inference that he or she would do likewise in the use of a product in which the manufacturer or distributor has failed to provide a necessary safety warning or *961 whose warning was deficient in one or more material respects affecting the safe use of the product. In such circumstances the burden of producing evidence that the injured person would not have complied with a proper safety warning had one been provided by the manufacturer or distributor of the product shifts to defendant, and lacking such proof plaintiff will be entitled to a directed verdict or the issue(s) of reliance and/or proximate cause. Sharpe v. Bestop, Inc., 314 N.J.Super. 54, 713 A.2d 1079, (App.Div.1998), aff'd 158 N.J. 329, 331-332, 730 A.2d 285, (1999).
Neither this case nor Varacallo involve product safety issues; at least none have been articulated by plaintiffs' counsel. Accordingly, applicability of the heeding presumption in the absence of affirmative proof of proximate cause has been cast in serious doubt. On the other hand, this court is bound by the Varacallo opinion and must, therefore, assume that the heeding presumption would also be applied to establish proximate cause in this case at least as to New Jersey resident class members even in the absence of a product safety issue, unless the NJCFA is held to apply to a nationwide class, which, for the reasons set forth below, this court concludes does not so apply. Such presumption would then apply to those claims by plaintiffs that material facts concerning operation of the Ricoh RDC-1 camera were knowingly concealed by Ricoh from the camera's purchasers with the intent by Ricoh that such purchasers rely upon the absence of such information concerning any material operational deficiencies in the use of the camera.
The conclusion of the Varacallo court as to applicability of this presumption with respect to the issue of causation is that plaintiffs must first "establish the core issue of liability". Id. at 51, 752 A.2d 807. Moreover, it should also be noted that Varacallo deals with a class limited to New Jersey residents and not a nationwide class. Accordingly, the Varacallo court's analysis and its application of the heeding presumption must be understood in light of those circumstances.
Have plaintiffs adequately established the "core issue of liability"? If they have not, the burden of proving causation as to each class plaintiff would be a significant obstacle in the path of class certification. As mentioned earlier, the court's role is not to decide questions of fact, but to make judgments as to questions of law. Plaintiffs must satisfy the requisites for class certification mandated by 4:32-1.
Plaintiffs in this case have presented no proofs to date that the allegedly fraudulent affirmative representations by Ricoh as to product features proximately caused any of class members to suffer an "ascertainable loss of money or property", nor have they yet supported their claims of omissions of material facts with proof that defendant intended by such factual omissions to deceive purchasers of the RDC-1 camera which proofs may or may not be developed during further discovery in this matter. Accordingly, on the claim of concealment of material facts, plaintiffs do not at present come within the Varacallo heeding presumption and in the absence of such proofs at trial, they would bear the burden of proving proximate cause on the concealment issue as well.
Plaintiffs in their reply brief attempt to obtain the benefit of the heeding presumption on the issue of causation by arguing that virtually all the affirmative misrepresentations they enumerate in their initial brief are concealments of material facts.
In their initial brief in support of their motion for class certification at pages 67, plaintiffs raise only one claim of concealment of material facts which is summarized in detail on page 5, paragraph 8 of *962 this opinion. Two other claims of concealment were asserted in plaintiffs' complaint, page 7 paragraph 16(4) which are quoted at page 6 of this opinion. Plaintiffs argue in their reply brief as follows:
This case is like Varacallo. Ricoh concealed material information from purchasers of the RDC-1 camera, including, as described below in Section E, that the RDC-1(i) could not autofocus within a shooting range of sixteen inches; (ii) could not manually focus within sixteen inches without being connected to an optional monitor or television set; (in) could not adjust exposure, focus or white balance after the initial settings were made; (iv) could not transmit full motion video via modem or digital cellular phone; (v) could not easily have its data accessed by computers running Windows or Macintosh operating systems; (vi) could not output to any color PC and video printer."
The same language in Ricoh's promotional material cannot be construed both to be an affirmative representation, as initially argued by plaintiffs, and as concealment of a material fact as they have later asserted. The wording of each relevant statement contained in Ricoh's advertisements will govern whether the feature or function of the RDC-1 camera was affirmatively misrepresented or concealed, or based on the proofs submitted by Ricoh, was accurately stated. The issue is one of fact upon which plaintiffs will bear the burden of proof unless the facts are sufficiently clear and the allegations of fraud are so lacking in scientific support that the issue becomes one of law for the court to resolve.
As demonstrated above, both Oliveira and Weinberg rejected the notion that even if the price of a product was inflated by heightened product demand allegedly resulting from false or fraudulent advertising, any such price increase can constitute an "ascertainable loss" under the consumer fraud statutes of their respective states. Oliveira compares the "fraud on the market" theory with the market theory of causation. As the Illinois Supreme Court in Oliveira stated:
Plaintiff's theory of causation bears marked similarities to the "fraud on the market" theory found in federal securities case law. See e.g., Basic Inc. v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), but see Kaufman v. iStat Corp., 165 N.J. 94, 113-118, 754 A.2d 1188 (2000) (discussing criticisms of the theory). [Id., 776 N.E.2d at 156 Fn.1.]
In Kaufman v. i-Stat Corp., 165 N.J. 94, 754 A.2d 1188 (2000) the New Jersey Supreme Court declined to apply the fraud on the market theory to prove indirect reliance on deliberately false statements issued by a corporation which were alleged to have artificially inflated the price of the securities and to support plaintiff's claims of common law fraud and negligent misrepresentation. The Supreme Court rejected the fraud on the market theory based upon recent criticisms of that theory among which was the inability of plaintiffs to employ that theory to prove causation satisfactorily.
The Kaufman court rejected the Efficient Capital Markets Hypothesis ("ECMH"), which is the theoretical underpinning of the fraud on the market theory, to prove indirect reliance. The ECMH "proposes that the price of a stock reflects information known about a corporation whose securities trade publicly." Id. at 113, 754 A.2d 1188. The extent to which the price of a security reflects such information "is expressed by three different forms of market efficiencystrong, semi-strong, and weak." Ibid. *963 The weaknesses attendant upon reliance upon the ECMH were summarized in Kaufman as follows:
In a strong form efficient market, all information that exists about a company and would be of interest to a purchaser of the company's securities is reflected, nearly instantaneously, in the price of the stock, such that no individual can expect to gain a greater return from that security than from any other security, and no individual can hope to perform better than any other individual over the long term. The weak form of the ECMH, by contrast, proposes that the price of the stock eventually reflects publicly available information. There is widespread agreement among economists and investment professionals that the national stock markets of the United States display weak-form efficiency. (Citation omitted).
Semi-strong efficiency, which is somewhere between the other two forms in holding that most information about a company is reflected in its price fairly quickly, appears to be the form assumed to exist by the United States Supreme Court in Basic. (Citation omitted).
The ECMH, perhaps because it posits that no investor can consistently outperform the market regardless of the amount of research or work undertaken beforehand, is a favorite subject for academics but is often discounted by investment professionals.

* * * * *
Because the ECMH fails to adjust for the noise and chaos inevitable in any system created by the acts of so many participants, one observer has gone so far as to contend that "obsolescence renders the ECMH false in all its forms." Id. at 548, 754 A.2d 1188. Other writers have commented on causation uncertainty in understanding market reactions, noting, among other things: how inefficiently prices reflect earnings; how other publicly available financial information is underreflected; how other information, such as historical underperformance, affects price; and how the activities of underrational "noise traders" and those otherwise affected by investor sentiment distort the picture. (Citation omitted) [Id. at 113-115, 754 A.2d 1188]
The Kaufman court's refusal to apply the "fraud on the market" theory to securities claims founded upon common law fraud was based upon the following analysis:
Even at the time of the Basic decision, skeptical voices were heard. Dissenting from the majority opinion, Justice White wrote that "with no staff economists, no experts schooled in the `efficient-capital-market hypothesis,' no ability to test the validity of empirical market studies, we are not well equipped to embrace novel constructions of a statute based on contemporary microeconomic theory." 485 U.S. 224 at 253, 108 S.Ct. at 994-95, 99 L.Ed.2d at 222. There is no greater proof now than there was then that the theoretical foundation for the fraud-on-the-market theory is as strong as its proponents maintain.
Yet now, despite there being no basis for increased acceptance of the idea of fraud on efficient markets, plaintiff asks us to expand its use beyond the carefully balanced world of the federal securities laws to the vastly more diverse universe of common-law fraud claims. In addition to our skepticism concerning its validity when used in the context of securities markets, we note that plaintiffs in other jurisdictions have attempted to establish that markets in assets other than securities are efficient enough to *964 allow use of the fraud-on-the-market theory. Various opinions we have examined have rejected use of the theory in those other settings. The Alabama Supreme Court has rejected the fraud-on-the-market theory numerous times in the consumer fraud context. See Ex parte Household Retail Servs., Inc., 744 So.2d 871 (1999); Ex parte Exxon Corp., 725 So.2d 930 (1998); Butler v. Audio/Video Affiliates, Inc., 611 So.2d 330 (1992). Id. at 116-117, 754 A.2d 1188
Significantly, the Kaufman court has supported its rejection of the "fraud on the market" theory with respect to common law fraud claims by citing with apparent approval three Alabama Supreme Court opinions which also rejected the "fraud on the market" theory in the consumer fraud context. Ex parte Household Retail Servs., Inc., 744 So.2d 871 (Ala.1999); Ex parte Exxon Corp., 725 So.2d 930 (Ala. 1998); Butler v. Audio/Video Affiliates, Inc., 611 So.2d 330 (Ala.1992). The "fraud on the market" theory and its counterparts, the "market inflation" theory and the "price inflation" theory, appear to be founded upon the same concept that the price of a product or security is directly responsive to false representations and/or factual concealments concerning the characteristics, features or value of a product, service or security. Plaintiffs advance this theory as the foundation for the requirements that they prove both proximate cause and an ascertainable loss under the NJCFA. However, plaintiffs have provided no proof and cited no reported case supporting the price inflation theory, other than the opinions of intermediate appellate courts of Pennsylvania and Illinois in the Weinberg and Oliveira cases, both of which have since been reversed by the Supreme Courts of those states.[3]
The stock market and the digital camera market are inherently different. No proof has been tendered as to the market sensitivity of the digital camera market. Accordingly, this court is unable to assess the extent to which product price is affected, if at all, by false representations or factual concealments about that product. No reported cases have been cited to the court which approve the "price inflation" theory as an accepted means of proving proximate cause or an ascertainable loss under the NJCFA or any comparable consumer fraud statute. In the absence of such proof or citation to a reported case so holding, this court concludes, as did the court in Kaufman, that the price inflation theory is not relevant to the issue of proximate *965 cause and is too speculative to establish an ascertainable loss.
Even as to those purchasers of Ricoh's model RDC-1 digital camera who read and were influenced to some extent by the allegedly false representations and/or product feature concealments in purchasing the camera and assuming the class were limited to such purchasers, plaintiffs have provided no proofs as to the difference between the camera's fair market value and the amount charged by Ricoh, nor has any rationale been provided by plaintiffs as to how such an evaluation could, without undue speculation, reasonably be made. Moreover, plaintiffs have not demonstrated that, applying a price inflation analysis, there was more than a de minimus effect on the camera's price caused by Ricoh's alleged fraudulent advertising representations or concealment.
B. Requirements of Rule 4:32-1(a)
Cases interpreting the class certification rules, R.4:32-1(a) and R.4:32-1 (b)(3) have made clear the types of claims which qualify and each precondition which must be met by plaintiffs for class action certification.
1. Numerosity
R.4:32-1(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." The proposed class consists of all United States purchasers of the Ricoh model RDC-1 digital camera. The plaintiffs have provided the court with a Ricoh inventory report (Bates No. RC 0854). The spreadsheet indicates a total of 4,450 cameras were sold, net of returns. If many such purchasers suffered ascertainable losses proximately caused by Ricoh's alleged fraudulent advertising campaign, this total would easily satisfy the numerosity requirement. As one court observed: "The class of 81 property owners seeking money damages is sufficiently large to meet the numerosity requirement." Saldana v. City of Camden, 252 N.J.Super. 188, 193, 599 A.2d 582, (App.Div.1991).
In this case however, plaintiffs have not provided any evidence as to how many purchasers of the RDC-1 camera can satisfy the requirements of proximate cause and an ascertainable loss of moneys or property since plaintiffs have provided no proof as to how many purchasers read the advertisements prior to their purchase of the camera and were thereby caused to make the purchase because of the alleged misrepresentations and material omissions. Moreover, Jeffrey L. Lengyel ("Lengyel"), who is the Marketing Manager in the Consumer Products Group of Ricoh and as such was responsible for supervising marketing of Ricoh's RDC-1 digital camera, certified that he "had knowledge of and participated in responding to complaints and inquiries regarding the RDC-1 camera," that he was familiar with every complaint received from purchasers of the camera, including those made by plaintiffs, and that "[t]here have been absolutely no complaints received by Ricoh that are even remotely similar to the allegations made by the Finks." Had a substantial number of other purchasers of the RDC-1 camera come forward with complaints similar to those of plaintiffs, a finding of numerosity could have been readily made. However, plaintiffs have presented no evidence of any such complaints brought against Ricoh in conjunction with the RDC-1 camera by other customers. Plaintiffs have also failed to tender any evidence that those class members who are able to meet the proximate cause element of the NJCFA also have suffered the requisite ascertainable loss.
However, plaintiffs were constrained by the following corporate history in obtaining proofs on the issue of numerosity. Ricoh's *966 Consumer Products Group, which was responsible for processing customer feedback, moved from Sparks City, Nevada beginning in September 1998. At that time, Ricoh underwent a significant corporate downsizing. In doing so, all of the records of consumer interaction with Ricoh were destroyed. These documents were purged as a matter of company policy, with no apparent relation to this litigation which was filed nearly two years later on June 12, 2000. Indeed, the first notice Ricoh received that any claim of consumer fraud was being asserted by plaintiffs was upon receipt by Ricoh's general counsel, Robert F. Polucki, Esq. of letters dated December 17 and 18, 1998 from Joel Fink and Frank H. Loomis, Esq., respectively. These letters were received about three months after destruction of the aforesaid records. Counsel for plaintiffs have argued that proof of customer complaints similar to their own might be established through further depositions of a representative of a Texas Company which handled the customer service line. During oral argument of this motion counsel advised the court that because of limitations on the deposition discovery they were authorized to take, they had taken no such depositions and the likelihood of plaintiffs securing such proof from discovery, particularly in light of Lengyel's certification, is at present clearly speculative.
On the other hand, despite the lack of other complaints relating to the allegedly fraudulent promotional literature, it may be inferred that the focus of any market campaign by defendant is that its promotional materials be read and relied upon as at least one factor in the purchasing decision. Assuming, as prior courts have instructed be done in class action certification, that the claims contained in the complaint of plaintiffs are true, Delgozzo v. Kenny, supra., 266 N.J.Super. at 181, 628 A.2d 1080, see, Riley v. New Rapids Carpet Center, supra., 61 N.J. at 223, 294 A.2d 7, it may properly be inferred that any purchaser who read the advertisements was in some way caused by the misrepresentations and/or material omissions in Ricoh's promotional literature to buy the camera. Whether or not enough purchasers fall into this category to satisfy the numerosity requirement for certification of a nationwide class, or whether the number and location of such purchasers is sufficiently small as to require a narrowing of the proposed class, or whether the number of customers who were caused by Ricoh's promotional literature to make such purchases is too small to justify class action certification, is presently unknown.
There is no precise number that distinguishes between a class that satisfies the condition of numerosity and one that does not. Nevertheless, as one court held: "Precise enumeration of the members of a class is not necessary for the action to proceed as a class action (citation omitted). It is permissible to estimate class size." Zinberg v. Washington Bancorp, Inc., 138 F.R.D. 397, 405 (D.N.J.1990). However, plaintiff's proofs are insufficient for the court to find or estimate that there is an adequate number of purchasers who read Ricoh's promotional literature and were caused by the allegedly fraudulent content of such promotional literature to purchase a model RDC-1 digital camera and that a sufficient number of those purchasers suffered an actual economic loss, thereby satisfying the numerosity requirement of 72.4:32-1(a). On the other hand, the numerosity requirement may be met by additional proofs sufficient to establish a class too large to join individually, but sufficient in size to meet the numerosity requirement. Such class would include only those members for whom the proofs demonstrate that a causal nexus exists between the allegedly *967 fraudulent advertising campaign of Ricoh and an ensuing actual loss. However, since other grounds exist for denying class action certification, plaintiffs need not be afforded time for additional discovery and an opportunity to present proofs which will satisfy the numerosity requirement.
2. Commonality.
R. 4:32-1(a)(2) requires that "there are questions of law or fact common to the class." This does not mean that all questions need be common. Federal courts have explained that, "not all questions of law or fact raised need be in common." Weiss v. York Hospital, 745 F.2d 786, 808-809 (3d Cir.1984), cert.den., 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985). In New Jersey, Delgozzo has followed the lead of the federal courts in holding that "a single common question is sufficient." Delgozzo v. Kenny, supra., 266 N.J.Super. at 185, 628 A.2d 1080, (quoting In re Asbestos School Litigation, 104 F.R.D. 422, 429 (E.D.Pa.1984), aff'd. in part and vacated in part sub nom, In re School Asbestos Litigation, 789 F.2d 996 (3rd Cir.1986), cert. den., 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986)). As the Delgozzo court held: "The existence of questions concerning individual representations made to a plaintiff, or relating to proof of damages, should not be a bar to upholding a class action where there are significant common questions as to liability." Id at 185, 628 A.2d 1080.
However, "... commonality becomes obscured when the probable unique issues of liability, causation and damages in each case are considered, requiring individualized treatment at trial." Saldanav. City of Camden, supra, 252 N.J.Super. at 197, 599 A.2d 582.
Ricoh disseminated many promotional items through a host of media. Plaintiffs allege that the basic misrepresentations contained in Ricoh's overall marketing scheme for the RDC-1 model camera were to some degree set forth in each advertisement. Plaintiffs provided the court with a list of questions of law and fact (Pb 13-14) which they assert are common to all members of the class. Based on information provided, the following questions could be found to be common to all class members:
1). Did Ricoh's promotional and marketing activities designed to promote the sale of its model RDC-1 digital camera violate the NJCFA?
2). Did Ricoh engage in the sale of its model RDC-1 digital camera by publishing promotional literature or engaging in an advertising campaign which contained false affirmative representations concerning various features or functions of that model digital camera which it did not possess and could not perform to any appreciable extent?
3). Did Ricoh engage in a course of conduct designed to promote the sale of its model RDC-1 digital camera by publishing promotional literature which apart from affirmative misrepresentations, concealed material shortcomings in the operation of that model camera?
4). Did Ricoh's intend to deceive purchasers of its model RDC-1 digital camera by willfully concealing material information about one or more of the camera's operational shortcomings?
Plaintiffs have articulated a number other questions which they assert are common to the members of the proposed national class. This court has concluded that the questions set forth below are either not common to the class or are not encompassed by the NJCFA.
Plaintiffs contend that Ricoh charged a higher price for its digital camera than was charged by manufacturers or distributors *968 of cameras with comparable features and functions and that such higher prices resulted from or were supported by Ricoh's allegedly deceptive or fraudulent advertising or marketing scheme. This contention has been converted by plaintiffs' counsel into what they contend is a common question and is based upon plaintiffs' price inflation theory which this court has rejected as not being relevant either to the issues of proximate causation or "an ascertainable loss."
Plaintiffs contend "[w]hether Ricoh's actions have proximately caused injury to plaintiffs and other members of the class, and if so, what is the proper measure of such damages" and another similarly worded question on damages represents common questions of law and/or fact. This court has concluded that individual questions of fact as to proximate cause and damages have been raised as to each class member and that the questions of law under the NJCFA as to proximate cause and damages have already been resolved by the statute and the cases decided thereunder, assuming that the NJCFA could and were to be applied across a nationwide class.
Plaintiffs contend that another common question of fact is "[w]hether Ricoh's actions were sufficiently wrongful so as to entitle plaintiffs and other members of the class to punitive damages." However, although three times the actual damages are made mandatory by the provisions of N.J.S.A. 56:8-19, common law punitive damages or damages under the New Jersey Punitive Damages Act, N.J.S.A. 2A:15-5.9 to -5.17, are not expressly provided for by the NJCFA and are only allowed in cases of common law fraud, a cause of action not pleaded by plaintiff's complaint. See Gennari v. Weichert Co. Realtors, supra., 148 N.J. at 611-612, 691 A.2d 350.
Although a number of individual questions remain, the common questions referred to above and those discussed in the section on "typicality" below suffice to satisfy the requirement for commonality.
3. Typicality
R.4:32-1(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." The standard for this requirement is laid out in In re Cadillac, supra. 93 N.J. at 425, 461 A.2d 736 where Court held: "The claims of the representatives must `have the essential characteristic common to the claim of the class."` (quoting 3B Moore's Federal Practice, para. 23.06-2 (1982)). The plaintiffs certainly share with the other class members the common questions of law and fact articulated above. Nevertheless, plaintiffs and members of the proposed class have individual questions of law and fact which may or are not shared with each other.
Prior to filing their class action complaint, plaintiffs engaged in correspondence with Ricoh's attorney. In a letter dated April 6, 1999, Ricoh, through its attorney, offered Fink, without prejudice, in exchange for the camera plaintiffs purchased, a full reimbursement or, alternatively, delivery to plaintiffs of "a later model digital camera." The plaintiffs chose to pursue litigation rather than accept the offer. While it remains unknown to the court why plaintiffs would take the time and effort to pursue a case in which the outcome is uncertain when such an offer was presented, plaintiffs' decision to reject the defendant's settlement offer does not support defendant's argument that plaintiff suffered no damages and therefore is not a typical class representative. *969 [4] Moreover, Ricoh's offer of settlement would appear to be inadmissible in evidence, N.J. Evidence Rule 408, unless defendant could prove an exception to the exclusionary rule, such as evidence demonstrating applicability of N.J.S.A. 12A:2-508 which may not be relevant to any claim or defense under the NJCFA, although such argument has not been briefed and, therefore, is not being foreclosed by the court.
In addition, plaintiff's counsel has also made two arguments in defense of his client's position. First plaintiffs argue that there is no law requiring plaintiffs to accept refunds. Plaintiffs' counsel reasoned that if the law were in accord with Ricoh's position, class action suits could be rendered moot, or essentially "bought off," simply by making a refund offer. In addition, under New Jersey law, successful plaintiffs are entitled to treble damages, the possibility of which is a preventative measure aimed at deterring fraudulent practices. The Appellate Division, in Skeer v. EMK Motors Inc., 187 N.J.Super. 465, 469-70, 455 A.2d 508 (App.Div.1982), bolsters this point, reasoning as follows: "The treble damage provision is part of an act designed to prevent unconscionable commercial practices in connection with sale or advertisement of any merchandise or real estate."
On the other hand, although Ricoh offered plaintiffs a full refund of the purchase price of the camera upon its return to Ricoh or, alternatively, to send plaintiffs the latest model of its digital camera, plaintiffs rejected defendant's offer without either mentioning the statute's provision for treble damages or providing evidence that treble the amount of the actual damages suffered, if any, by plaintiffs exceeded the refund value of the RDC-1 model camera purchased by plaintiffs.
Plaintiffs seek to certify a nationwide class comprising all 4450 purchasers of the RDC-1 model camera without any evidence that a substantial number of such purchasers were caused to purchase the camera by the allegedly false representations and concealments contained in Ricoh's advertising literature. It is reasonable to infer that many of the purchasers of the RDC-1 model camera did not read or were not caused to purchase the camera by the allegedly false representations and concealments made by Ricoh upon which plaintiffs claimed they relied. To the contrary it is reasonable to conclude that many of the purchasers of the Ricoh RDC-1 digital camera based their purchase decision on other factors such as recommendations of relatives, friends, camera buffs or retail sales representatives or upon the appearance of the camera or upon its price, or upon accurate statements concerning other features of the camera contained in Ricoh's promotional literature or on the carton in which the camera was packaged and sold or in the instruction manual which was provided with the camera or upon reading favorable independent reviews of the camera which did appear in newspapers, magazines or periodicals. To the extent that such purchasers were not caused by Ricoh's alleged false advertising to purchase the RDC-1 camera, they will not qualify as a claimant under the proximate cause element of the NJCFA. *970 Thus, individual questions of fact will have to be resolved as to each class member, namely (a) whether he or she read Ricoh's promotional literature; (b) was he or she caused by Ricoh's allegedly false representations to purchase the camera, (c) to the extent that Ricoh's alleged concealment of material facts proximately caused such purchase, did Ricoh knowingly intend prospective purchasers to rely upon such fraudulent concealments; (d) do the defendant's proofs demonstrate that the class members usually follow product instructions, even if not safety instructions, and if so, can such class member establish proximate cause pertaining to any such concealment through use of the heeding presumption; and (e) whether each such class member suffered an ascertainable loss of moneys or property.
While plaintiffs have presented proof that they were influenced by Ricoh's allegedly false representations and concealments to purchase the camera, no such proofs have been tendered by or on behalf any of the proposed class members. Moreover, since plaintiffs' theory of price inflation has been rejected by the court, neither plaintiffs for themselves nor any class member has presented proof of an ascertainable loss proximately caused by such alleged false representations and concealments. Again, in the absence of another reason, here present, to deny their motion to certify a nationwide class, plaintiffs would have been given an opportunity to articulate another theory of ascertainable loss supported by the facts.
Lengyel submitted a certification demonstrating that Ricoh marketed its RDC-1 camera in four different system packages. Lengyel described the contents of these four system packages for the RDC-1 camera as follows:
System Package #1RDC-1 digital camera, AK-1 accessory kit, DM-1 monitor, RDT-1 communication Serial Adapter and FC-8MB memory card.
System Package #2RDC-1 digital camera, AK-1 accessory kit, DM-1 Monitor and RTD-1 communication serial adapter.
System Package # 3RDC-1 digital camera, AK-1 accessory kit, Communication Serial Adapter and FC-8MB memory card.
System Package # 4RDC-1 digital camera, AK-1 accessory kit, RDT-1 communication serial adapter and FC-8MB memory card.
According to Lengyel, Fink purchased the System Package # 4. Plaintiffs do not dispute this statement.
In addition to these system packages, Ricoh sold a number of accessories for the RDC-1 camera. These included, apparently among others, the DM-1 NJSC LCD color monitor, the RDT-1 Communication/Serial Adapter, the FC-2 Megabyte reusable memory card, the FC-8 megabyte reusable memory card, the FC-24 megabyte reusable memory card and the DW-1 X 0.7 wide angle adapter lens. Lengyel does not state when these accessories were first distributed by Ricoh with the RDC-1 camera and in what manner, if at all, they bear on plaintiffs' allegations of consumer fraud in this case.
Although Lengyel contends that the alleged differences in Ricoh's System Packages render the owner of Package # 4 "unable to comment upon or serve as an adequate representative of the other three RDC-1 camera packages", he does not give an adequate explanation for this conclusion. Lengyel merely states that: "... package # 4 is materially different from packages 1, 2 and 3 in a significant way." Lengyel goes on to explain the latter conclusion by stating that: "kit 4 does not contain a detachable LCD monitor" *971 The only appreciable differences between Packages # 1 and # 2 and Packages # 3 and # 4 is that Packages # 3 and # 4 each contained an FC-8MB memory card not sold with Packages # 1 and 2, and a DM-1 Monitor was sold with Packages # 1 and # 2 but not with Packages # 3 and # 4. Also Package # 3 was equipped with a "Communication Serial Adaptor," whereas the other three packages were equipped with an "RDT-1 communications serial adapter." It is likely that Lengyel's certification inadvertently omitted the reference to "RDT-1 before the words communications serial adapter" on package # 3, but this assumption cannot be confirmed.
Lengyel contends that "[t]he monitor affords the user the primary benefit of digital imaginginstantaneous viewing of captured images and movies. The users opting not to purchase a kit with a detachable LCD monitor would utilize the included audio and video cables connected to a TV set or video monitor to see the images and movies that were captured."
Plaintiffs have not submitted any testimony or expert's report showing that Fink is personally qualified to render any opinion testimony regarding the falsity of the affirmative representations or concealments of material fact except as applicable to system package # 4. To the extent plaintiffs wish to demonstrate that such allegedly false representations and concealments apply with respect to Packages # 1, 2 and 3, such proofs will have to be presented through an expert witness.
In the light of Lengyel's certification summarized above, the following questions appear to be additional common questions applicable to plaintiff and all class members (1) Did the purchase of the DM-1 monitor eliminate all of the alleged mechanical shortcomings in the RDC-1 model camera which plaintiffs contend Ricoh misrepresented or willfully concealed, and if not, did Ricoh's promotional literature or instruction manual describe how the user would use the audio and video cables included with the camera to overcome all such shortcomings by attaching those cables to a TV set or video monitor? (2) What shortcomings in the functioning of the RDC-1 digital camera which plaintiffs contend comprise one are more false representations or concealments of material fact, if any, were present with installation of the DM-1 monitor on System Packages # 1 and # 2? (3) Did the purchase and installation of the Communication Serial Adapter on System Package # 3 and the RDT-1 Communication Serial Adaptor on System Package # 4 cause or eliminate any of the alleged mechanical shortcomings or features regarding the functioning of the RDC-1 camera which plaintiff contend were affirmatively misrepresented or concealed by Ricoh (4) Do plaintiffs' claims of allegedly false affirmative representations regarding camera functioning and alleged willful concealments of material fact apply to System Packages # 1, #2 and # 3?
Because of this court's analysis of the conflicts-of-law issue, its affect on the predominance and superiority issues and the impact of those decisions on the need to resolve factual and legal issues which affect only individual members of the proposed class, all of which are discussed in substantial detail below, this court concludes that plaintiffs have not demonstrated, as they are required to do, that their claims are typical of the claims of the class.
Adequacy of Representation
R.4:32-1(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." The factors needed to satisfy this requirement were enumerated by the court in Gross v. Johnson & Johnson, 303 N.J.Super. *972 336, 342-343, 696 A.2d 793, (Law Div. 1997) as follows: "Elements of this requirement include the interests of the named representative being co-extensive with the interests of the other members of the class and the assurance that the representatives will vigorously prosecute those interests, which requires the assistance of responsible and able counsel." Accordingly, the requirement as to adequacy of representation is met if (1) plaintiffs' attorney is "qualified, experienced and generally able to conduct the proposed litigation" and (2) if plaintiff's interests are not "antagonistic to those of the class." Delgozzo v. Kenny, supra, 266 N.J.Super. at 188, 628 A.2d 1080, (quoting In re Asbestos School Litigation, supra, 104 F.R.D. at 430).
The resumes of the attorneys representing the plaintiffs in this litigation demonstrate their extensive experience in the conduct of class action litigation, and their conduct of this litigation to date has caused this court to conclude that plaintiffs' attorneys will conduct the litigation in a highly professional manner. In addition, although as demonstrated below, based on the choice-of-law analysis, plaintiffs' interests do not appear to be coextensive with any class members not residing in Missouri or in a state whose consumer fraud laws do not differ from those of Missouri, plaintiffs do not appear to have any interests antagonistic to those of the class. Therefore, the court finds that the requirements of 4:32-1(a)(4) as to adequacy of representation have been satisfied.
The requirements of R. 4:32-1(a) have been discussed and the proofs satisfy the conditions needed to establish commonality and adequacy of representation. The numerosity and typicality requirements, however, have not been met.
In addition to establishing only two of the four requirements of 4:32-1(a) referred to above, because of the choice-of-law analysis made below, plaintiff must also meet the requirements of the two conditions of #.4:32-1(b)(3). The conditions set forth in section 4:32-1(b)(1) and (2) are not pertinent under the facts of this case. Plaintiffs cannot, however, satisfy the requirements of predominance and superiority based upon conflicts-of-law analysis set forth in detail below.
C. Requirements of Rule 4:32-1(b)(3)
1. Predominance
R.4:32-1(b)(3) requires that the court must find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Plaintiff has the burden of proving such predominance. In re Cadillac, supra., 93 N.J. at 426, 461 A.2d 736. Thus, predominance requires plaintiff to prove that the issues common to the class outweigh those that are not. Saldana v. City of Camden, supra., 252 N.J.Super. at 197, 599 A.2d 582, Gross v. Johnson & Johnson, supra., 303 N.J.Super. at 343, 696 A.2d 793, (Law Div.1997). In cases where many common issues exist, this condition is not always met. See e.g., Saldana v. City of Camden, supra.; Carroll v. Cellco Partnership, supra., 313 N.J.Super. at 499-503, 713 A.2d 509, (App.Div.1998); Gross v. Johnson & Johnson, supra., Even where the individual issues are fewer than common issues, it is the significance of the uncommon issues that sways the pendulum. "The individual differences, however, must be of lesser overall significance and they must be manageable in a single class action." In re Ford Motor Co. Ignition Switch Products Liability Litigation, 194 F.R.D. 484, 488 (D.N.J.2000).
The Court in In re Cadillac, supra., defined the elements of predominance as follows:
*973 A conclusion on the issue of predominance requires an evaluation of the legal issues and the proof needed to establish them. As a matter of efficient judicial administration, the goal is to save time and money for the parties and the public and to promote consistent decisions for people with similar claims. Fed R. Civ.P. 23 Advisory Committee Note, 39 F.R.D. 98, 102-03 (1966). Some times the common questions may not warrant certification of a matter as a class action, but in other cases they will be sufficient to sustain class action even if they do not dispose of the entire matter. 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1778 at 54 (1972). If a "common nucleus of operative facts" is present, predominance may be found. Id. at 53. From another perspective, the basic question is whether the potential class, including absent members, seek "to remedy a common legal grievance." 3B Moore's Federal Practice 23.45 [2] at 23-332 (1982). [93 N.J. at 430-431, 461 A.2d 736].
Chief among this court's concerns is the determination of which state's law should apply to each member of the class.
The court, in Castano v. American Tobacco Company, supra., imposed upon the motion court the duty to make a choice-of-law analysis before deciding whether plaintiff has satisfied the predominance element, holding as follows:
In a multi-state class action, variations in state law may swamp any common issues and defeat predominance. See Georgine v. Amchem Prods., 83 F.2d 610, 618 (3d Cir.1996) (decertifying class because legal and factual differences in the plaintiffs' claims "when exponentially magnified by choice of law considerations, eclipse any common issues in this case"); American Medical Sys., 75 F.3d at 1085 (granting mandamus in a multi-state products liability action, in part because "[t]he district court ...failed to consider how the law of negligence differs from jurisdiction to jurisdiction").
Accordingly, a district court must consider how variations in state law affect predominance and superiority. (Citation omitted)

* * * * * *
A district court's duty to determine whether the plaintiff has borne its burden on class certification requires that a court consider variations in state law when a class action involves multiple jurisdictions. "In order to make the findings required to certify a class action under Rule 23(b)(3)... one must initially identify the substantive law issues which will control the outcome of the litigation." Alabama v. Blue Bird Body Co., 573 F.2d 309, 316 (5th Cir.1978).
A requirement that a court know which law will apply before making a predominance determination is especially important when there may be differences in state law. (Citations omitted). [Id., 84 F.3d at 741]
In Carroll v. Cellco Partnership, supra the Appellate Division adopted the Castano rational pertaining to the need for the trial court to conduct a careful choice of law analysis before concluding that plaintiffs had satisfied the predominance condition for class action certification, stating as follows:
In Castano, the court held that, in a nationwide class action, a predominance inquiry that did not include a discussion of how variations in state law would affect predominance and superiority constituted reversible error. Id. at 740. The court also recognized as error the district court's failure to explain how a trial on the merits would be conducted. *974 Ibid. The court reached this decision because it determined that in multistate class actions, variations in state law may overwhelm common issues and preclude a finding of predominance. Id. at 741. An examination of a jury interrogatory and verdict form; a survey of medical monitoring decisions, consumer fraud actions and punitive damage laws in the defendants' home states; and reliance on two district court opinions provided an insufficient basis to certify a class of plaintiffs alleging injuries from nicotine addiction. Id. at 742-43. What was missing was a discussion of how the court would deal with variations in state law and how these variations would affect predominance. Id at 743.
Although "conflict of law issues do not per se foreclose certification of a multistate class * * * [a] thorough analysis of state laws is particularly important in circumstances where ...there is a possibility that common issues could be subsumed by substantive conflicts in state laws." Carroll v. Cellco Partnership, supra., 313 N.J.Super. at 497, 713 A.2d 509.
New Jersey has rejected lex loci delicti or the place of wrong, as governing the choice of law in tort cases, favoring instead the more flexible "governmental-interest test" pursuant to which the law of the state with the greatest interest in governing the specific issue in the underlying litigation is applied. Veazey v. Doremus, 103 N.J. 244, 247-248, 510 A.2d 1187 (1986); Gantes v. Kason Corp., 145 N.J. 478, 484, 679 A.2d 106, (1996); Fu v. Fu, 160 N.J. 108, 118-119, 733 A.2d 1133, (1999); Erny v. Estate of Merola, 171 N.J. 86, 99-100, 792 A.2d 1208, (2002).
The first step in a governmental interest analysis is to determine whether a conflict exists between the law of the interested states. Any such conflict must be determined on an issue-by-issue basis. Veazey v. Doremus, supra., at 248, 510 A.2d 1187; Gantes v. Kason Corp., supra., at 484, 679 A.2d 106, Fu v. Fu, supra., at 118, 733 A.2d 1133, Erny v. Estate of Merola, supra., at 100, 792 A.2d 1208.
A review of the consumer fraud statutes of the various states, and the cases decided thereunder demonstrates the existence of numerous actual conflicts on various issues between provisions of the NJCFA and those of the statutes enacted by other states.
Thus, New Jersey not only permits, but also encourages the bringing of private class actions under the NJCFA. Olive v. Graceland Sales Corp., 61 N.J. 182, 185, 293 A.2d 658, (1972); Riley v. New Rapids Carpet Center, supra., 61 N.J. at 228, 294 A.2d 7, Delgozzo v. Kenny, supra., 266 N.J.Super. at 192, 628 A.2d 1080.
On the other hand, several states, including Mississippi, Montana, South Carolina and Alabama, bar private class action consumer fraud suits. Miss.Code Ann. § 75-24-15(4); American Bankers Ins. Co. of Florida v. Booth, 830 So.2d 1205 (Miss.2002); Mont.Code Ann. § 30-14-133(1); S.C.Code Ann., 39-5-140(a); Wilson Group v. Quorum Health Resources, 880 F.Supp. 416, 427 (D.S.C.1995); ALA.Code § 8-19-10(f); Ex parte Exxon Corp., 725 So.2d 930 (Ala.1998) (enforcing the statutory provision which limits the right to bring a representative class action to Alabama Attorney General and the state District Attorneys). The State of Iowa prohibits all private consumer fraud actions and limits the Iowa statute's remedies to actions commenced by the state's attorney general who may institute the action on behalf of either the state or the injured party. IOWA Code Ann. § 714.16(7).
New Jersey permits actions under its consumer fraud statute where defendant's *975 fraud concerns the sale of goods or services purchased either for personal, family or household uses or for commercial or business uses.
For cases allowing recovery of remedies under the NJCFA for fraudulent practices in the sale of goods or services purchased for personal, family or household uses, see e.g., Lemelledo v. Beneficial Management Corp. of America, 150 N.J. 255, 265, 696 A.2d 546, (1997) (holding that the NJCFA applies to the offering, sale or provision of consumer credithere, $1,000.00 loan for the education of plaintiff's daughter); Strawn v. Canuso, 140 N.J. 43, 59-61, 657 A.2d 420, (1995) (holding that the NJCFA applies to fraudulent concealments of material facts by professional sellers of residential housing, and by brokers representing them, pertaining to the existence of a toxic waste dump in the vicinity of the houses being sold, justifying class action certification on behalf of all purchasers from defendants of homes located in the vicinity of the toxic waste site). Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 541 A.2d 1063, (1988) (involving the sale of a power boat with a defective engine, but in which the court held that plaintiff had failed to prove an unconscionable commercial practice had been utilized by defendant in making the sale); Varacallo v. Mass. Mut. Life Ins. Co., supra., 332 N.J.Super. at 40-45, 752 A.2d 807, (involving class action certification on behalf, of purchasers of "vanishing premium" whole life insurance policies which plaintiffs contended defendant sold by withholding material information as to its dividend rates which plaintiffs contended defendant had knowingly and intentionally inflated). Skeer v. EMK Motors Inc., 187 N.J.Super. 465, 455 A.2d 508 (App.Div. 1982) (holding that defendant had engaged in deceptive practices in violation of the NJCFA by violating the New Jersey Administrative Code).
For cases allowing recovery of statutory remedies under the NJCFA in connection with the purchase of goods and services for commercial or business uses, see, e.g., City Check Cashing v. The National State Bank, 244 N.J.Super. 304, 309, 582 A.2d 809, (App.Div.), certif. den. 122 N.J. 389, 585 A.2d 391, (1990) (holding that (1) the NJCFA applies to corporations and other business entities when they are acting as consumers because business entities are considered a "person" under the Act and no reason exists to treat it differently and (2) to be a "consumer" in respect to a transaction, the business entity must be one who uses the goods and thereby diminishes their economic utility); Hundred East Credit Corp. v. Eric Schuster, 212 N.J.Super. 350, 355, 515 A.2d 246, (App. Div.), certif. den. 107 N.J. 60, 526 A.2d 146, (1986). On the other hand, purchasers of goods at wholesale who resell them at retail are not protected by the NJCFA. Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co., 226 F.Supp.2d 557, 560-561 (D.N.J.2002).
Other states, including Missouri where plaintiffs reside, Pennsylvania, where the vendor from whom plaintiff purchased the Ricoh digital camera is located, and Mississippi confine their consumer fraud statute remedies to items purchased "primarily for personal, family or household purposes." Mo. Ann Stat., § 407. 025(1); Ziglin v. Players MH, L.P., 36 S.W.3d 786, 790 (Mo.App. E.D.2001); 73 P.S. § 201-9.2; Weinberg v. Sun Company, Inc. 565 Pa. 612, 777 A.2d 442 (2001) (Pennsylvania consumer fraud statute requires plaintiff in class action suit "to allege he purchased gasoline for personal or household purposes as opposed to business purposes"); Trackers Raceway, Inc. v. Comstock Agency, Inc., 400 Pa.Super. 432, 583 A.2d 1193 (Pa.Super.1990) *976 (rejecting a claim under the PUTPCPA against four insurance companies, an insurance brokerage firm and two individuals pertaining to the purchase of liability insurance covering a go-cart racetrack operator upon the grounds that the insurance policy was purchased for commercial purposes only and thus not intended to be governed by the Pennsylvania consumer fraud act which, under section 201-9.2(a), was only applicable to persons who purchase or lease goods or services "primarily for personal, family or household purposes"); Miss.Code Ann. § 75-24-15(4).
The New Jersey Appellate Division very recently concluded that the parties to a consumer fraud case were entitled to a trial by jury. Zorba Contractors, Inc. v. Housing Authority of the City of Newark, 362 N.J.Super. 124, 827 A.2d 313 (App.Div. 2003). Only one other state to decide the issue, namely Kansas, reached the same conclusion. Waggener v. Seever Systems, Inc., 517, 233 Kan. 517, 664 P.2d 813 (1983).
Three states, including Illinois, Massachusetts and Connecticut, have reached an opposite conclusion, and its highest appellate courts have held that since the remedy is statutory, no right of jury trial exists. Martin v. Heinold, Commodities, Inc., 163 Ill.2d 33, 205 Ill.Dec. 443, 643 N.E.2d 734 (1994); Travis v. McDonald, 397 Mass. 230, 490 N.E.2d 1169 (1986); Associated Investment Co., L.P. v. Williams Associates IV, 230 Conn. 148, 645 A.2d 505 (1994).
Differences also exist in judicial interpretations of the requirements for proof of proximate cause between the consumer fraud act violation and the damage claims asserted.
The New Jersey Supreme Court has concluded that the 1971 amendment to the Act permitting a private right of action imposes a higher standard of proof than that applicable to enforcement of proceedings brought by the state Attorney General, holding that [w]hile the Attorney General does not have to prove that the victim was damaged by the unlawful conduct, N.J.S.A. 56:8-2, a private plaintiff must show that he or she suffered "an ascertainable loss ... as a result of the unlawful conduct." Meshinsky v. Nichols Yacht Sales, Inc., supra., 110 N.J. at 473, 541 A.2d 1063, (1988). The burden imposed upon a private plaintiff on the issue of proximate cause has been held to require proof that said person has been "... misled and damaged as a proximate result of a violation of the act in order to have standing to sue." Knapp v. Potamkin, 253 N.J.Super. 502, 505, 602 A.2d 302, (Law Div.1991). Thus, the "causal nexus" requirement requires proof that the prohibited act must in fact have misled, deceived, induced or persuaded the plaintiff to purchase defendant's product or service. Chattin v. Cape May Greene, 216 N.J.Super. 618, 641, 524 A.2d 841, (App.Div.), certif. den. 107 N.J. 148, 526 A.2d 209, (1987). In order to meet the test of proximate cause, there must some "direct relation" between the unlawful conduct and the injury asserted. Interchange State Bank v. Veglia, 286 N.J.Super. 164, 179-180, 668 A.2d 465, (App.Div.1995), certif. den. 144 N.J. 377, 676 A.2d 1092, (1996). Therefore, it has been held that proximate cause "must be limited to those cases which are so closely connected with the result and of such significance that the law is justified in imposing liability." Yun v. Ford Motor Co., 276 N.J.Super. 142, 151, 647 A.2d 841, (App.Div.1994) (citing Caputzal v. The Lindsay Co., 48 N.J. 69, 77-78, 222 A.2d 513 (1966), rev'd o.g., 143 N.J. 162, 669 A.2d 1378, (1996). The above cases appear to adopt the "but for" test of proximate cause in cases arising under the NJCFA.
*977 It is clear that New Jersey has adopted the "but for" test of proximate cause in tort cases. Conklin v. Hannoch Weisman, 145 N.J. 395, 417, 678 A.2d 1060, (1996); Camp v. Jiffy Lube # 114, 309 N.J.Super. 305, 706 A.2d 1193, (App.Div.), certif den. 156 N.J. 386, 718 A.2d 1215, (1998). The "but for" test of proximate cause has been modified in New Jersey by reference to the "substantial factor" test to explain for the jury the meaning of the "but for" test. Vuocolo v. Diamond Shamrock Chem., 240 N.J.Super. 289, 294-295, 573 A.2d 196, (App.Div.), certif. den., 122 N.J. 333, 585 A.2d 349, (1990). Reference to the "but for" test has been disapproved in New Jersey jury charges where there are concurrent or intervening causes of harm. Conklin v. Hannoch Weisman, supra., at 419, 678 A.2d 1060, Vuocolo v. Diamond Shamrock Chem., supra., at 294, 573 A.2d 196. In cases where concurrent causes are involved, only the "substantial factor" test is applicable. Ibid.
An intervening cause, however, will be deemed to destroy the causal connection between a defendant's negligence or other tortious conduct where such intervening cause constitutes an unforeseeable independent act which constitutes the immediate and sole cause of the accident, injury or loss. Davis v. Brooks, 280 N.J.Super. 406, 412, 655 A.2d 927, (App. Div.1993). An intervening cause "... must be one that so entirely supercedes the operation of the first tortfeasor's negligence that it alone caused the injury, without the first tortfeasor's negligence contributing thereto in any material way." Ibid. On the other hand, "[i]ntervening causes that are reasonably foreseeable or are normal incidents of a risk ... do not relieve a tortfeasor of liability." Cruz-Mendez v. ISU/Insurance Services, 156 N.J. 556, 575, 722 A.2d 515, (1999) (citing Rappaport v. Nichols, 31 N.J. 188, 203, 156 A.2d 1, (1959)).
That the intent in New Jersey consumer fraud cases is to employ the "but for" test as modified by the "substantial factor" test, where concurrent or intervening causes are not implicated, to define proximate cause for the jury has been clarified by the provisions of the applicable model jury charges. See, 4.23 Model Charge Under Consumer Fraud Act (5/98; revised 1/01), at pp. 4-5 (instructing the trial court, when charging the jury on proximate cause, to utilize the definition of proximate cause which may be found in 7.10 Proximate CauseGeneral Charge To Be Given In All Cases (5/98) and 7.11 Proximate CauseRoutine Tort Case Where No Issues Of Concurrent Or Intervening Causes, Or Foreseeability Of Injury Or Harm (8/99).
Other states only apply the "but for" test of proximate cause in tort cases without any reference to the "substantial factor" test. No cases have been found interpreting the term "proximate cause" under the consumer fraud statutes of Delaware, Nebraska or North Dakota which suggest any different test would be applied to interpret the proximate cause element under the consumer fraud statutes in those respective states. Duphily v. Delaware Elec. Cooperative Inc., 662 A.2d 821, 828-829 (Del.1995); Stiver v. Allsup, Inc., 255 Neb. 687, 587 N.W.2d 77, 82 (1998), Jones v. Ahlberg, 489 N.W.2d 576, 582 (N.D. 1992).
On the other hand, North Carolina applies only the "substantial factor" test in defining the elements of proximate cause. American Rockwool, Inc. v. Owens Corning Fiberglas, 640 F.Supp. 1411, 1444 (E.D.N.C.1986).
Michigan combines a "but for" test of proximate cause with a "socially and economically desirable" test. Adas v. Ames *978 Color-File, 160 Mich.App. 297, 407 N.W.2d 640, 642 (1987) (holding that: "Proximate cause requires two factors: (1) cause in fact but for causation, and (2) Legal Causethe nexus between the wrongful acts and the injury sustained must be of such a nature that it is socially and economically desirable to hold the wrongdoer liable").
Differences exist among the several states with regard to the need for proof that defendant's representations about its products or services were willfully or knowingly false or made with specific intent to deceive and those states, including New Jersey, which do not impose any such proof requirement.
Where the alleged violation of the NJCFA involves an affirmative act, plaintiff is not required to prove defendant's intent to deceive or knowledge of the misrepresentation, nor to prove actual deceit or fraud. Gennari v. Weichert Co. Realtors, supra., 148 N.J. at 606-607, 691 A.2d 350, Cox v. Sears, Roebuck & Co., 138 N.J. 2, 17-18, 647 A.2d 454, (1994); Leon v. Rite Aid Corp., 340 N.J.Super. 462, 468, 774 A.2d 674, (App.Div.2001). Moreover, an affirmative violation of an administrative regulation governed by the NJCFA is sufficient to impose strict liability upon the business entity violating such regulation even though the business entity acted in good faith and meant no harm to the purchaser of the goods or services. Scibek v. Longette, 339 N.J.Super. 72, 80, 770 A.2d 1242, (App.Div.2001) (involving violation of regulations requiring an automobile dealer to provide the customer with a written estimate and obtain a written authorization from the customer before starting to repair the automobile).
On the other hand, the NJCFA requires proof of both knowledge and intent by any person who makes a "knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission..." N.J.S.A. 56:8-2; Gennari v. Weichert Co. Realtors, supra., 148 N.J. at 607-608, 691 A.2d 350, Cox v. Sears, Roebuck & Co., supra., at 18, 647 A.2d 454, Varacallo v. Massachusetts Mut. Life Ins., Co., supra., 332 N.J.Super. at 43, 752 A.2d 807.
A number of states, including Oregon, Louisiana and Illinois, require proof of willful intent to deceive even when the alleged violation of the consumer fraud statutes in those states involves an affirmative representation or act. Or.Rev.Stat. § 646. 638(1); Sanders v. Francis, 277 Or. 593, 561 P.2d 1003 (1977); United Group of Nat'l Paper Distributors v. Vinson, 666 So.2d 1338 (La.App.), cert. den 679 So.2d 1358 (La.1996); Eshaghi v. Hanley Dawson Cadillac Co., 214 Ill.App.3d 995, 158 Ill.Dec. 647, 574 N.E.2d 760, 764 (1991).
Idaho, Kansas, Oklahoma Nevada and Massachusetts require proof under their consumer fraud acts of defendant's knowledge of the falsity of its affirmative representations. Idaho Code § 48-603; State ex rel. Kidwell v. Master Distributors, Inc., 101, 101 Idaho 447, 615 P.2d 116 (1980); Kansas Stat. Ann. § 50-626(b)(1) Waggener v. Seever Systems, Inc., 233 Kan. 517, 522, 664 P.2d 813 (1983); Okla Stat. Ann. Tit. 15 § 753(5) and (7); Murray v. D & J Motor Co., Inc., 958 P.2d 823, 832 (Okla.Civ.App.1998); Nev.Rev.Stat. Ann. § 598. 0915 (amended by 1999, Nevada Laws, Ch. 604 (A.B.431); State ex rel. List v. AAA Auto Leasing & Rental, Inc., 93 Nev. 483, 568 P.2d 1230 (1977); Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc., 764 F.2d 928, 935-937 (1st Cir.1985) (applying Mass. Law).
Utah requires proof under its consumer fraud act of either intent to deceive or knowledge of the falsity of defendant's *979 affirmative misrepresentations, while South Dakota requires proof of both knowledge and intent under its consumer fraud statute. Utah Code Ann § 13-11-4(2); Pace v. Parrish, 122 Utah 141, 247 P.2d 273 (1952); Iadanza v. Mather, 820 F.Supp. 1371, 1381 (D.Utah 1993); S.D.Code Ann. § 37-24-6; Stene v. State Farm Mut. Auto. Ins. Co., 583 N.W.2d 399, 404 (S.D.1998).
California and Pennsylvania require proof under their consumer fraud acts of justifiable reliance by plaintiff on defendant's deceptive acts. Occidental Land, Inc. v. Superior Court of Orange County (Fahnestock), 18 Cal. 3d 355, 134 Cal.Rptr. 388, 556 P.2d 750, 755 (1976); (holding that each class member was not required to prove justifiable reliance when "an inference of reliance arises if a materially false representation was made to persons whose acts thereafter were consistent with reliance upon the representations."); Weinberg v. Sun Company, Inc., supra., 777 A.2d 442 (holding that "Nothing in the legislative history [of the Pennsylvania consumer fraud act] suggests that the legislature ever intended statutory language directed against consumer fraud to do away with the traditional elements of reliance and causation" and, accordingly, in order to maintain a class action suit under the Pennsylvania consumer fraud act, "a plaintiff must allege reliance").
Michigan requires proof under its consumer fraud statute that a reasonable person would have relied on defendant's misrepresentations, but proof of individual reliance is not required. Dix v. American Bankers Life Assurance Company of Florida, 429 Mich. 410, 415 N.W.2d 206 (1987) (holding "that members of a class proceeding under the Consumer Protection Act need not individually prove reliance on the alleged misrepresentations. (Footnote omitted). It is sufficient if the class can establish that a reasonable person would have relied on the representation").
Arizona, on the other hand, requires proof of individual reliance, but does not require proof that such reliance was reasonable. Parks v. Macro-Dynamics, Inc., 121 Ariz. 517, 591 P.2d 1005 (1972).
North Carolina requires proof of "actual" and "detrimental" reliance upon defendant's misrepresentations, from which it may be inferred that such reliance need not necessarily be reasonable. Forbes v. Par Ten Group, Inc., 99 N.C.App. 587, 394 S.E.2d 643 (1990) (holding that recovery under the North Carolina Unfair and Deceptive Trade Practices Act "... is limited to those situations when a plaintiff can show that plaintiff detrimentally relied upon a statement or misrepresentation, and he or she `suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation."`); Pleasant Valley Promenade v. Lechmere, Inc., 120 N.C.App. 650, 464 S.E.2d 47 (1995) (affirming directed verdict in favor of defendant upon grounds that plaintiff had failed to prove actual reliance).
There is no uniform test for the award of damages sustained by a victim of consumer fraud under the statutes of the various states.
Under the NJCFA an award must be made of threefold the actual damages suffered by the victim of any practice declared unlawful under our statutes, plus an award of reasonable attorney's fees and costs of suit to the successful plaintiff. N.J.S.A. 56:8-19; Cox v. Sears, Roebuck & Co., supra., 138 N.J. at 24, 647 A.2d 454. However, neither punitive damages nor attorney's fees may be awarded against a real estate broker, brokersalesperson or salesperson for communicating "any false, misleading or deceptive information provided to" such brokers and sales persons *980 "by or behalf of the seller of real estate located in New Jersey" provided that the defendant; "(a) had no actual knowledge of the false, misleading or deceptive character of the information" and "(b) had made a reasonable and diligent inquiry to ascertain whether or not the information was of a false, misleading or deceptive character. * * *" N.J.S.A. 56:8-19.
Treble damages are a form of punitive damages. Wanetick v. Gateway Mitsubishi, 163 N.J. 484, 495, 750 A.2d 79, (2000). However, the only form of punitive damages expressly allowed by the NJCAF are treble damages. N.J.S.A. 56:8-19; Gennari v. Weichert Co. Realtors, supra., 148 N.J. at 611-612, 691 A.2d 350.
Like New Jersey, Nevada's statute also mandates an award of treble the actual damages suffered by a successful plaintiff. Nev.Rev.Stat. Ann. 598A.210.
In Tennessee and Pennsylvania the award of treble damages is discretionary with the trial judge, provided, however, that in Tennessee the proofs demonstrate that the violation of its statute is both willful and knowing. Tenn.Code Ann. XX-XX-XXX(a)(3); Smith v. Scott Lewis Chevrolet, Inc., 843 S.W.2d 9, 12 (Tenn.Ct.App. 1992).
The Pennsylvania statute permits an award of three times the actual damages in the discretion of the trial court, but not less than $100, and also provides for an award of actual damages or $100, whichever is greater. The Pennsylvania statute also grants the trial court discretion to award reasonable attorney's fees and costs of suit to the successful plaintiff. 73 P.S. § 201-9.2; Hammer v. Nikol, 659 A.2d 617, 620 (Pa.Cmwlth.1995) (award of attorney's fees and costs, as well as double, rather than treble, damages are within the trial court's discretion); Johnson v. Hyundai Motor America, 698 A.2d 631, 639 (Pa.Super.1997) (standard for award of treble damages, which is discretionary is whether the actor's conduct was "malicious, wanton, willful, oppressive or exhibited a reckless indifference to the rights of others"), appeal den. 551 Pa. 704, 712 A.2d 286 (Pa.1998); McClelland v. Hyundai Motor America, 851 F.Supp. 680, 681 (E.D.Pa.1994) (limiting award to $100 where plaintiff had driven car purchased from defendant 36,000 miles, used it for three years and defendant did not act outrageously, although the court did find violation of the Pennsylvania consumer fraud act.)
The statutes of a number of states, namely Alaska, Colorado and Ohio, grant the trial court discretion to award treble damages upon request of the injured party, but incorporate a dollar minimum on the amount of such damages which may be awarded. Alaska Stat. 45.50.531 (the injured person may seek and the trial court may award treble the actual damages or $500, whichever is greater); State of Alaska v. O'Neill Investigations Inc., 609 P.2d 520, 524 (Alaska 1980) (allows award of treble damages for willful violations of the Alaska consumer fraud act); Colo.Rev.Stat. Ann. § 6-1-113(2)(a) (the court may award three times the actual damages, or $500, whichever is greater, if it is proven that the defendant engaged in bad faith conduct); Quist v. Specialties Supply Co., Inc., 12 P.3d 863, 867 (Colo.Ct. App.2000) (where the court held plaintiff was precluded under principles of collateral estoppel from challenging the amount of actual damages fixed by the judgment, but holding that collateral estoppel did not preclude plaintiff from pursuing enhanced punitive damages); Ohio Rev.Code Ann. 1345.09(B)(the injured party may seek and the trial court in its discretion may rescind the contract or award treble the actual damages or $200, whichever is greater); *981 Crye v. Smolak, 110 Ohio App.3d 504, 674 N.E.2d 779 (1996)(holding that treble damages are appropriate under Ohio law when the seller engages in an unconscionable practice or deceptive act).
Connecticut, Delaware and Kentucky make no provision in their respective consumer fraud statutes for treble damages, but by statute or case law allow an award of punitive damages in the court's discretion. Conn. Gen.Stat. 42-110g (allows an award of punitive damages in the court's discretion); Gargano v. Heyman, 203 Conn. 616, 525 A.2d 1343 (1987) (award of punitive damages is dependent upon proof of "reckless indifference to the rights of others or an intentional and wanton violation of those rights"); Stephenson v. Capano Development, Inc., 462 A.2d 1069, 1077 (Del.1983) (punitive damages are allowed in the trial court's discretion if court finds the "fraud to be gross, oppressive or aggravated or where it involves a breach of trust or confidence;" however, no punitive damages may be allowed unless compensatory damages are awarded); Ky.Rev.Stat. Ann. 367.220(1) (permits award of actual damages, equitable relief and punitive damages within the discretion of the trial court).
Iowa, Oklahoma and Wisconsin allow an award of statutory civil penalties, in addition to actual damages, but make no provision for either treble or common law punitive damages. Iowa Code Ann. 714.16(7) (Attorney General, acting on behalf of injured party, may obtain recovery of actual damages and restitution and seek appointment of a receiver for defendant, and the court may in its discretion also award a civil penalty against defendant in an amount up to $40,000); State ex rel. Miller v. Santa Rosa Sales & Marketing, Inc., 475 N.W.2d 210, 219 (Iowa 1991); Okla Stat. Ann., Tit. 15, § 761.1(A) and (B) (allows award of actual damages, reasonable attorney's fees and costs incurred by a successful plaintiff and the court has discretion to award a civil penalty against defendant of up to $2000 for each violation); Walls v. American Tobacco Co., 11 P.3d 626, 629 (Okla.2000); Wis. Stat. Ann §§ 100.18 and 100.26 (for nine routine cases of consumer fraud separately listed by the statute a civil penalty of not less than $50 nor more than $200 per violation may be awarded in the discretion of the court. For cases involving fraudulent use of a community's name or involving a sale of a product which in fact is not available for sale or where the purpose of advertisement is not to sell the advertised product or products, a civil penalty of not less than $100 nor more than $10,000 per violation may in the discretion of the court be imposed) State v. Weller, 109 Wis.2d 665, 327 N.W.2d 172 (1982).
A number of states, including Kansas, Oregon and West Virginia, do not allow for punitive damages as such, but do provide for either actual damages or a dollar amount fixed by their respective statutes, whichever is greater. Kan. Stat. Ann. 50-634(b)(allows award of the greater of actual damages or $10,000 for each violation); Watkins v. Roach Cadillac, Inc., 7 Kan. App.2d 8, 637 P.2d 458 (1981); Or.Rev. Stat. 646. 638(1) (allows the award of actual damages or $200, whichever is greater); Riviera Motors, Inc. v. Higbee, 45 Or.App. 545, 609 P.2d 369 (1980); W.Va.Code 46A-6-106 (1) (allows award of actual damages, or $200, whichever is greater); Muzelak v. King Chevrolet, Inc., 179 W.Va. 340, 368 S.E.2d 710 (1988).
Maine allows only for an award of actual damages, restitution, equitable relief and reasonable attorney's fees in pursuing the consumer fraud claim. The Maine statute makes no provision for the award of treble damages, punitive damages, civil penalties *982 or a minimum monetary award. Me.Rev. Stat. Ann. Tit. 5, § 213(1) and (2).
In addition to New Jersey and Maine which have previously been identified as mandating the award of reasonable attorney's fees to a prevailing plaintiff, Wisconsin, Alabama, Texas, New Hampshire; Vermont, South Carolina, Idaho and Utah also mandate an award of reasonable attorney's fees to a prevailing plaintiff. Wis. Stat. Ann. 100. 18(11)(b); Ala.Code 8-19-10(f) (recovery limited to actual loss suffered, plus reasonable attorney's fees and costs); Tex. Bus & Commerce Code Ann. § 17.50(d); N.H.Rev.Stat. 358-A:10 I; Vermont Stat. Ann., Tit. 9 § 2461(b) (providing "any consumer may sue for ... reasonable attorney's fees"); Gramatan Home Investor's Corp. v. Starling, 143 Vt. 527, 470 A.2d 1157 (1983)(construing Vermont statute as mandating award of reasonable attorney's fees to successful plaintiff and denying any discretion to trial court on this issue); South Carolina Stat. Ann. 39-5-140(a); Idaho Stat. Ann. 48-607; Utah Code Ann. 13-11-17.5.
In addition to the Pennsylvania statute discussed above, 173 P.S. 201-9.29(a), the Montana, Oregon, Oklahoma and Kansas statutes have granted the trial court discretion to award attorney's fees to a successful plaintiff. Mont.Code Ann. XX-XX-XXX; Or.Rev.Stat. Ann. 646.638(3); Okla. Stat. Ann.Tit. 15, § 761.1(A); Kan. Stat. Ann. 50-634(e).
The discussion of the differences between the NJCFA and the consumer fraud laws of the other states is not meant to be exhaustive but merely illustrative of the numerous differences between New Jersey law and that of the other states in the area of consumer fraud.
Having established numerous conflicts in the consumer fraud law of New Jersey as compared with the provisions in the consumer fraud statutes of numerous other states, "[t]he second prong of the governmental-interest analysis requires the court to determine which state has the most significant relationship to the occurrence and the parties" with respect to each relevant area of conflict or on an issue by issue basis. Fu v. Fu, supra., 160 N.J. at 119, 733 A.2d 1133 (1999); accord, Veazey v. Doremus, supra., 103 N.J. at 248, 510 A.2d 1187. As the court in Veazey held:
If an actual conflict exists, the next step is to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contact to the litigation and to the parties. (Citations omitted). If a state's contacts are not related to the policies underlying its law, then that state does not have an interest in having its law apply. (Citations omitted). Consequently, the qualitative, not the quantitative, nature of a state's contacts ultimately determines whether its law should apply. (Citation omitted). Id.
See also, White v. Smith, 398 F.Supp. 130, 134 (D.N.J.1975) where the court, applying New Jersey conflicts of law principles, held: "In order to determine which state has the greatest interest in the application of its own law, each issue must be analyzed separately." The court in White further observed that "[i]f a strong state policy or interest will be neither fostered by applying that state's law, nor frustrated by the failure to apply it, it is highly unlikely that that state has any interest whatsoever in blanketing that particular issue with its law." Id. at 134.
Applying Restatement (Second) of Conflict of Laws § 145, Comment f (1971), five factors guide the courts in applying the governmental-interest test in tort cases. These include "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the *983 field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." Fu v. Fu, supra., 160 N.J. at 122, 733 A.2d 1133, Erny v. Estate of Merola, supra., 171 N.J. at 101, 792 A.2d 1208. Fu v. Fu, supra., at 122-126, 733 A.2d 1133, instructs the trial court in how to apply each of these factors.
The Restatement factors, as explained by Fu v. Fu, supra., and by Erny v. Estate of Merola, supra., support application of the law of the place of residence of the potential claimant and to a lesser extent the place of purchase of the Ricoh digital camera, rather than to a nationwide class under the consumer fraud law of New Jersey whose primary contact with the parties and transaction is the location in West Caldwell, New Jersey of the principal place of business of Ricoh.
The "interests of interstate comity" clearly require application of the law of any potential claimant's state of residence because application of any other state's law would frustrate the domiciliary state's legislative policies as articulated by Fu v. Fu, supra., 160 N.J. at 122-23, 733 A.2d 1133.
Courts considering this factor are required to determine "whether application of a competing state's law would frustrate the policies of other interested states." Ibid. At least four states identified above bar consumer fraud class action suits, and at least one of those states, Iowa, bars any private right of action under its consumer fraud law. Several differences in the burdens of proof on proximate cause are imposed upon a private plaintiff. Many states limit the remedies available to private plaintiff, and others preclude recovery for any claimant who did not purchase the product or service primarily for a personal, family or household purpose, but instead made the purchase for a business. Two of these states, Missouri and Pennsylvania, have far greater contacts with the transaction and with the plaintiffs than does New Jersey, and both preclude recovery for fraud related to the purchase of a product primarily for a business purpose, as was the case here. These statutes reflect the public policies of the states, which have enacted them. The promotional brochures were developed in Japan and Nevada, not in New Jersey. To ignore the policies of these states by applying New Jersey consumer fraud law across a nationwide class of potential claimants primarily because Ricoh has its principal place of business in New Jersey would frustrate the public policies of those other states.
Because the NJCFA, N.J.S.A. 56:8-2 imposes liability upon "any person who uses any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission", such statute deals with a field of tort law. See, Holmin v. TRW, Inc., 330 N.J.Super. 30,35, 748 A.2d 1141 (App.Div.2000). Thus, the NJCFA concerns itself with "the interest underlying the field of tort law." This requires the court to consider both deterrence and compensation. To the extent that "the tort rule primarily serves a deterrent purpose," Fu v. Fu, supra., 160 N.J. at 123, 733 A.2d 1133, instructs that "the state where the harmful conduct took place will likely have the dominant interest with respect to the rule." On the other hand, "[w]hen the tort rule is designed primarily to compensate a victim for his or her injuries, the state where the injury occurred, which is often where the plaintiff resides, may have the greater interest in the matter." Ibid.
*984 The most significant of the Restatement factors in the tort field according to Fu is the fifth factor which requires the court to assess the "competing interests in the states." Id. at 125, 733 A.2d 1133. The Erny court characterizes the elements of this factor as representing "the contacts which are most germane to the governmental-interest test." Erny v. Estate of Merola, supra., 171 N.J. at 102-103, 792 A.2d 1208 (2002). The elements of this factor were identified in both the Fu and Erny cases as follows: "(1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place incorporation and place of business of the parties; and (4) place where the relationship, if any, between the parties is centered." Fu v. Fu, supra., 160 N.J. at 125, 733 A.2d 1133; Erny v. Estate of Merola, supra., 171 N.J. at 103, 792 A.2d 1208.
The Fu discussion of the "interests underlying the field of tort law" and the Erny government-interest factors described above clearly apply under the facts of this case. Missouri is the place of domicile and residence of plaintiffs. It is also the place where the harmful conduct allegedly causing the injury to plaintiffs occurred because Fink read the promotional literature which he obtained at a retailer located in St. Louis, Missouri which later induced him to purchase the Ricoh Model RDC-1 camera (Fink Dep. T. 56-19 to 59-14), received delivery of the camera in that state, attempted to utilize the camera in that state (Fink Dep. T. 74-6 to 20) and discovered the alleged misrepresentations and concealments of material facts as to the performance capabilities of the camera in that state.
Lengyel had contact in connection with his activities as marketing supervisor with Ricoh's corporate headquarters in West Caldwell, New Jersey, relative to the use of the corporate logo and he was provided with a logo usage document. He also had another contact concerning joint public relations activities. Lengyel's testimony in this area was not specifically related to the marketing of the RDC-1 model camera. There is certainly an inference which can be drawn from Lengyel's testimony that the use of the corporate logo was discussed in his conversation with Ricoh's corporate headquarters even though it may not have been directly related to the marketing of the RDC-1 camera and that the information furnished, together with the content of the corporate logo usage document, authorized that logo to be used on Ricoh's promotional and advertising brochures for the RDC-1 model camera.
Lengyel testified that some of the early sales brochures used in the marketing of the RDC-1 camera were created in Japan by the parent company, translated into English and printed in Japan. Lengyel himself worked on the preparation of other sales brochures while he was located in Reno, Nevada. However, no questions were directed to Lengyel seeking information as to where the brochures he helped create were printed or the location from which they were shipped to wholesale and retail distributors.
The Ricoh promotional literature which plaintiff Fink testified caused him to purchase this model camera primarily for use in his wife's orthodenture practice was prepared in Nevada by employees of Ricoh's Consumer Products Group in cooperation with employees of Ricoh Company, Ltd., Ricoh's Japanese parent corporation, which manufactured the camera and had prepared promotional literature to market the camera in Japan over a year before Ricoh began commercial marketing of the camera in the United States. Ricoh used a two tier distribution chain, including distributors, *985 wholesalers and resellers, to sell its RDC-1 Model Camera and its accessories in the United States. Plaintiffs contend that contact was had regularly between Joseph Bollentini, Vice President of the Ricoh Consumer Products Group in Nevada, and its New Jersey corporate headquarters, particularly in connection with Ricoh's promotional activities and the marketing of the RDC-1 Model Digital Camera. However, Lengyel's deposition fails to disclose that he had any personal knowledge as to the existence or nature of any such contacts other than that Bollentini reported to Yoshida, Ricoh's corporate president, in 1996. When asked whether Bollentini had contact with Yoshida concerning the RDC-1 camera, Lengyel's response was "I know of no specific conversation they had relative to that, While Lengyel knew that Bollentini would have contacted Yoshida while Ricoh had offices in Sparks, Nevada, Lengyel testified "I don't know if Joe Bollentini was obliged to share with Mr. Yoshida any specific information, but I do know he spoke with Mr. Yoshida periodically."
Fink purchased the RDC-1 Model Camera from a retail distributor located in Pennsylvania known as Egghead which shipped the camera to the office of Mrs. Fink in St. Louis, Missouri. The primary purpose for his purchase of the Ricoh camera was his belief that it would produce pictures which would benefit his wife's orthodenture practice. Prior to making the purchase of the camera he received a six page promotional brochure about the camera from a store in St. Louis, Missouri. Fink also made inquiry about the quality of the Ricoh camera with sales representatives in various camera and electronic equipment shops and testified that "everyone said it's the greatest, an unbelievable camera", but none of these stores had the camera on display, and he "just got to see the brochure." Prior to purchasing the camera, Fink never had a chance to try out the camera, and none of his friends had the camera.
Prior to purchasing the camera Fink's only direct contact with Ricoh was through a phone call in which Fink testified that he attempted to purchase the camera directly from Ricoh, but "... they said they would not sell it to me. They directed me to Egghead and they gave me the number and told me `This is how to purchase the camera. We don't sell directly to the public." That's the reason I went to Egghead and that's the way I purchased the camera.' During Fink's initial testimony about the phone call, he mentioned only one call prior to purchase the camera, and he was careful to explain that the content of that phone call was why he purchased the camera from Egghead. Later in his deposition Fink claimed he had one additional phone contact with Ricoh before he bought the camera. Fink also testified that he had three calls with Ricoh after the camera was purchased when he began to have operational problems with installing software on the hard drive of his computer.
Defendant's counsel incorrectly suggested to him that Fink had testified to two phone calls with Ricoh prior to purchase. Although this suggestion is not supported by the record, Fink accepted it and claimed that there were two phone calls prior to the purchase and both had the identical content. In view of Fink's testimony as to the first phone call, its direct relationship to the source of his purchase of the camera and Ricoh's policy not to sell directly to the public, there is no logical reason why Fink would have made a second phone call on the same subject. Nevertheless, the issue is one of Fink's credibility, which this court cannot make. In any event whether there were one or two phone calls on the same subject before *986 Fink purchased the camera has no bearing on resolution of the choice-of-law question.
Based upon the facts detailed above, the relationship between the parties is not founded upon any contract between the parties, but is centered solely upon plaintiffs' allegations of affirmative misrepresentations and concealments of material facts contained in Ricoh's promotional literature. That advertising campaign was planned and implemented by Ricoh in Nevada, not New Jersey. Whatever damages were suffered by plaintiffs, if any, as a result of Ricoh's alleged fraud occurred in St Louis, Missouri where Fink obtained and read one of Ricoh's promotional brochures and where he and his wife obtained delivery of the camera and attempted to make it function in accordance with its advertised mechanical capabilities. Thus, Missouri is the state with the closest connection to the parties.
Where reliance upon false or fraudulent representations or advertising constitutes a substantia] factor in causing plaintiff and any proposed class members to purchase a defendant's goods or services, the Restatement (Second) of Conflict of Laws § 148 identifies several factors which should be considered in determining which state has the most significant relationship to the occurrence and parties. These factors, which will govern which state's law should be applied, include the following:
(a) the place, or places, where the plaintiff acted upon the defendant's representations,
(b) the place where the plaintiff received the representations,
(c) the place where the defendant made the representations,
(d) the domicile, residence, nationality, place of incorporation and place of business of the parties,
(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time and,
(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.
In this case, factors (a), (b), (c), (d) (as to the proposed class members) and (f) are all likely to have occurred where the proposed class members resided since they are likely to have received the advertising brochure containing the allegedly false representations in the states of their residence, made their decisions to purchase the camera in those states, purportedly as a result of their having read and relied to a substantial extent on the content of such false representations, and incurred the legal obligation to made payment for the camera in those states. While Nevada is the state where defendant's advertising or promotional brochures were prepared, there is no information available as to where the brochures were printed or the state(s) from which they were distributed, but in all likelihood the states of residence of the putative class members are where purchasers of the camera became aware of the content and read such promotional literature, if that took place at all.
With respect to factor (e), no information is available as to where the cameras purchased by the proposed class members were situated at the time they read the promotional brochure and as result they decided to purchase the Ricoh model RDC-1 camera. The location of the camera at that point in time appears to have little or no significance unless the purchaser had access to the camera before he or she decided to purchase it and by inspection or test operation was able to determine the validity of the representations *987 concerning the camera's functioning, a factor of significance in those states requiring proof of reasonable reliance on fraudulent misrepresentations and concealments of material facts.
With respect to factor (d) the defendant Ricoh is incorporated in Delaware and has its principal place of business is in New Jersey. It is defendant's New Jersey principal place of business which plaintiffs contend support their argument for application of New Jersey's consumer fraud law across a nationwide class. However, a similar argument was rejected by the court in Lyon v. Caterpillar, Inc., 194 F.R.D. 206, 215 (E.D.Pa.2000), where the court reasoned as follows:
Factor (d), "the domicile, residence, nationality, place of incorporation and place of business of the parties," is similarly only marginally supportive to the plaintiff's primary contention that Illinois law applies in this case. Id. Although the defendant's principal place of business is in Illinois, its place of incorporation is in Delaware and putative class members may reside in any of the forty-one states listed by defendant. Additionally, § 148 states, in a comment, that:
The plaintiff's domicil (sic) or residence, if he is a natural person, or the principal place of business, if plaintiff is a corporation, are contacts of substantial significance when the loss is pecuniary in its nature ... This is so because a financial loss will usually be of greatest concern to the state with which the person suffering the loss has the closest relationship ... The domicil (sic), residence and place of business of the plaintiff are more important than are similar contacts on the part of the defendant. Id. § 148, cmt. i.
Therefore, putative class members' residence is a contact of greater significance than defendant's principal place of business.
The court would deprive the parties adversely affected of due process of law, particularly if the court arbitrarily applied the law of a state lacking "a significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class." Phillips Petroleum Company v. Shutts, 472 U.S. 797, 821-822, 105 S.Ct. 2965, 2979-2980, 86 L. Ed.2d 628 (1985) (citing Allstate Ins. Co. v. Hague., supra, 449 U.S. at 312-313, 101 S.Ct. at 639-640).
The third Restatement factor discussed in Fu is "the interests of the parties" which "requires courts to focus on their justified expectations and their needs for predictability of result." Fu v. Fu, supra., 160 N.J. at 123, 733 A.2d 1133, (quoting Pfizer, Inc. v. Employers Ins. Of Wausau, 154 N.J. 187, 199, 712 A.2d 634, (1998)). While this factor is "of extreme importance in the field of contracts," it "ordinarily plays little or no part in a choice-of-law question in the field of torts." Fu v. Fu, supra., 160 N.J. at 123, 733 A.2d 1133. Since this matter is a tort case, rather than a contract case, this factor bears little or no importance in the governmental interest conflict of laws issue which must be decided in this case.
The fourth Restatement factor discussed in Fu is the "interests of judicial administration" which "require the courts to consider the relative ease in determination of the choice of law regarding a specific issue" which "in turn furthers the values of uniformity and predictability of result." Id., 160 N.J. at 124, 733 A.2d 1133. However, such considerations "must yield to strong state interests implicated by the remaining factors." Ibid. The individual rights sought to be vindicated in this case *988 by plaintiffs, as distinguished from those of the putative class members whom plaintiffs seek to represent, must be governed by the law of Missouri, which is the state with the strongest interest in having its law applied to the resolution of the dispute involving the plaintiffs personally.
In addition to the aforesaid analysis of New Jersey choice-of-law principles, this court is persuaded by a similar analysis by at least two Federal District Court judges applying New Jersey conflict of law principles in class action consumer fraud litigation. Both judges have also rejected application of the substantive law of the forum or that of any other single state with substantial contacts with the transaction, instead concluding that the law of the state of residence of each putative class member would govern adjudication of that class member's rights. In re Ford Motor Company Ignition Switch Products Liability Litigation, 174 F.R.D. 332, 348 (D.N.J. 1997) (hereinafter "In re Ignition Switch No. In re Ford Motor Company Ignition Switch Products Liability Litigation, 194 F.R.D. 484, 489-490 (D.N.J.2000) (hereinafter In re Ignition Switch No. II"); Chin v. Chrysler Corporation, 182 F.R.D. 448, 457 (D.N.J.1998).
As the Court in In re Ignition Switch No. I, supra., 174 F.R.D. at 348349, explained:
Each plaintiff's home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws. These interests arise by virtue of each class member's case before certification. Since the laws of each of the fifty states vary on important issues that are relevant to plaintiffs' causes of action and defendant's defenses, the court cannot conclude that there would be no conflict in applying the law of a single jurisdiction, whether it be Michigan, or New Jersey, as the plaintiffs suggest. Thus, the court will apply the law of each of the states from which plaintiffs hail.

* * * * * *
In a motion for class certification, plaintiffs bear the burden of providing an "extensive analysis" of state law variations to determine whether there are "insuperable obstacles" to class certification. Walsh v. Ford Motor Co., 807 F.2d 1000, 1017 (D.C.Cir.1986) (citing In re School Asbestos Litig., 789 F.2d at 1010). "If more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law, yet another reason why class certification would not be the appropriate course of action." (In re American Medical Systems, Inc., 75 F.3d 1069, 1085 (6th Cir.1996) (reversing certification of nationwide class in products liability case). "Prior to certification, the district court must determine whether variations in state law defeat predominance." Castano, 84 F.3d at 750.
Plaintiffs' reliance upon Boyes v. Greenwich Boat Works, Inc., 27 F.Supp.2d 543 (D.N.J.1998) to support their argument for application of New Jersey law to a nationwide class action is misplaced. First, Boyes was not a class action suit. Second, the contacts with the State of New Jersey in Boyes were much more significant than they are in this case. In Boyes plaintiffs contended that identical false representations were made by Marvin Hitchner, president of defendant Greenwich Boat Works, at the boat show in Philadelphia, Pennsylvania and in Greenwich, New Jersey, the location of said defendant's boat yard and principal place of business. These representations concerned the range, speed and fuel consumption of the *989 Caterpillar engines installed on the Model Abermarle boat Hitchner intended to and ultimately did sell to plaintiff and which plaintiff had informed Hitchner were important considerations in his decision as to which boat he would purchase to participate in sports fishing tournaments. In this case precious little evidence has been tendered as to the involvement of Ricoh's corporate headquarters in the marketing campaign for the RDC-1 camera other than that its principal place of business is located in West Caldwell, New Jersey and that Ricoh probably authorized the use of its corporate logo on Ricoh's advertising brochures; but there is nothing in Lengyel's deposition to suggest that this was done specifically for the RDC-1 camera, but rather constituted a generally authorized use of the logo in the marketing of Ricoh's consumer products. Clearly, no evidence exists in this case, as there was in Boyes, that the allegedly false representatives were made to plaintiffs in New Jersey by any Ricoh officer or employee.
Plaintiffs' counsel has cited a large number of cases purportedly supporting their argument for application of New Jersey law under New Jersey's choice of law rules based primarily on the location of Ricoh's principal place of business being in New Jersey. Most of the cases relied upon by plaintiffs' counsel are distinguishable because the fraudulent misrepresentations in the consumer fraud cases or significant underlying facts supporting the cause of action pleaded took place in the state whose law was selected by the court to govern the rights of the parties. Avery v. State Farm Mutual Auto. Ins. Co., 321 Ill.App.3d 269, 254 IlI.Dec. 194, 746 N.E.2d 1242 (2001); Simon v. Philip Morris, Inc., 124 F.Supp.2d 46, 70 (E.D.N.Y.2000); In re Pizza Time Theatre Sec. Litig., 112 F.R.D. 15, 20 (N.D.Cal.1986); Randle v. Spectran, 129 F.R.D. 386, 394 (D.Mass. 1988); In re Kirschner Med. Corp. Sec. Litig., 139 F.R.D. 74, 84 (D.Md.1991); Grace v. Perception Tech. Corp., 128 F.R.D. 165, 171 (D.Mass.1989); In re ORFA Sec. Litig., 654 F.Supp. 1449, 1451 (D.N.J.1987); and In re Computer Memories Securities Litigation, 111 F.R.D. 675, 686 (N.D.Cal.1986).
One of the cases was a consolidated mass tort action rather than a class action and involved birth defects claimed to have been caused by ingestion of Bendectin, and its choice of law decision was based upon the fact that the Bendectin medication in this product liability case was manufactured in Ohio, and, accordingly, the law of Ohio was held to govern the rights of the parties, rather than the law of the states of plaintiff's residence since the state of manufacture was deemed to have more significant contact with plaintiffs' claims than that of their place of residence. In re Bendectin Litigation, 857 F.2d 290, 305 (6th Cir.1988), cert. den. sub. nom. Hoffman v. Merrell Dow Pharmaceuticals, 488 U.S. 1006, 109 S.Ct. 788, 102 L.Ed.2d 779 (1989).
In Perry v. Household Retail Services, Inc., 953 F.Supp. 1378 (M.D.Ala. 1996), the issue was whether to pierce the corporate veil and impose liability on the corporate parent of the defendant who was charged with violations of the Truth in Lending Act, the Racketeer Influenced and Corrupt Organizations Act (RICO) and Alabama and Illinois statutory and common law. This was not a class action and the opinion did not deal with choice of law issues.
In Martin v. Heinold Commodities, Inc., 117 Ill.2d 67, 109 Ill.Dec. 772, 510 N.E.2d 840 (1987) the selection of Illinois consumer fraud law over that of the states of residence of commodities purchasers was based largely on significant contacts of the defendant with the State of Illinois. All payments for the London Commodities *990 Options, which formed the basis for plaintiff's consumer fraud claims by concealing the broker's commissions and labeling them "foreign service fees," were to be remitted to defendant's Chicago office; "all complaints were to be made to the Chicago office;" and the Agreement establishing the agency relationship between defendant and the commodities purchasers was to become binding "only upon its receipt and approval by defendant at its Chicago office." Id. at 847. However, of considerable, perhaps greater importance to the court's decision to apply Illinois law were provisions in the Agency Agreement providing that Illinois law was to govern the Agreement and that "all legal disputes were to be adjudicated in the courts of Illinois or in Federal courts situated in Illinois." Ibid.
Various individual questions discussed in the section on "typicality" must be resolved as to each class member. In addition to those individual questions of fact, the conclusions reached above as to the conceivable applicability of the consumer fraud laws of 50 states of necessity raise other individual questions of fact which because of their scope and number would necessarily predominate over the common issues. These individual factual issues include, among others: (1) proximate cause in accordance with the definition of proximate cause of the state of residence of the class member; (2) whether and in what amount an ascertainable economic loss has been suffered by each class member; (3) actual and/or reasonable reliance, as defined by the courts of that member's state, by each such class member upon defendant's allegedly false representations or factual concealment; (4) whether defendant's alleged factual concealment was material; (5) whether defendant had knowledge of the falsity of the representation or concealment; (6) whether the defendant intended class members to rely upon the false representation or concealment of material facts; (7) whether the heeding presumption applies in any case involving a New Jersey resident to establish proximate cause in a factual concealment situation, including (a) whether the concealment involves a safety issue and (b) whether the class member customarily followed safety or other product instructions; (8) whether or not the camera was purchased solely for personal, family or household use in those states of residence where the consumer fraud statute so limits recovery; and numerous damage issues, including (9) whether the class member resides in states which make (a) an award of treble damages or (b) an award of punitive damages discretionary, and if so, (c) whether the class member's proofs meet the standards imposed by the statutes or courts of those states for the award of punitive or treble damages; (10) whether restitution should be awarded; and (11) whether, in those states allowing a statutory monetary award greater than the amount of pecuniary damages fixed by the fact finder, a class member should be awarded the statutory amount or some amount greater than his or her actual damages but less than the maximum dollar award permitted by statute. In addition to resolution of the factual issues enumerated above, there are issues which are solely legal in nature which would require adjudication. These include (1) the effect on class members from states whose statutes bar class actions in consumer fraud cases; (2) those who reside in states whose courts have interpreted their respective consumer fraud acts to bar the right to a jury trial; and (3) those who reside in states making the award of attorney's fees discretionary, and if so, whether each prevailing class member residing in such states should be awarded such fees.
*991 To the extent that a proposed class can be more narrowly constructed, it would have to be limited to those purchasers of the RDC-1 camera who read the Ricoh advertising brochures which contain the same fact representations and concealments that plaintiffs contend were misleading, false or fraudulent, who were thereby caused to purchase the camera and who suffered a pecuniary loss. To identify individuals making such claims would require extensive investigation and/or discovery. However, individual trials would not thereby be eliminated because defendant would have the right to challenge the credibility of any such claims. In addition, the issues raised by the application of the laws of as many as 50 states, assuming there are class members from all 50 states, would also have to be adjudicated. Under such circumstances certification of such a narrower class, requiring application of the consumer fraud laws of as many as 50 states "places the burden upon plaintiffs to `credibly demonstrate through an extensive analysis' of state law variances, `that class certification does not present insuperable obstacles."` In re Ignition Switch No I, supra., 174 F.R.D. at 340 (quoting Walsh v. Ford Motor Co., 807 F.2d 1000, 1017 (D.C.Cir.1986), cert. den. 482 U.S. 915, 107 S.Ct. 3188, 96 L.E.2d 677 (1987)); Chin v. Chrysler Corporation, supra.; 182 F.R.D. at 453; Lyon v. Caterpillar, Inc., supra., 194 F.R.D. at 219.
Plaintiff's counsel has failed to provide the court with an extensive analysis of state law variances, as counsel for the defendant did, nor has plaintiffs' counsel even attempted to satisfy their burden to credibly demonstrate "that class certification does not present insuperable obstacles." Ibid. Plaintiff's counsel has also failed to supply the court with proposed charges of the law covering each of the variances in state law, an obligation imposed upon class counsel in like circumstances. In re Ignition Switch No. I, supra, 174 F.R.D. at 348.
With the need to litigate individual issues of fact inherent in a class action and those necessitated by application of the consumer fraud laws of up to 50 states, plaintiffs have failed to satisfy their burden to demonstrate a predominance of common issues over issues of fact and law which affect only individual members of the proposed nationwide class. This finding accords with that of other courts which have reached similar conclusions on choice of law questions concerning the applicability of the laws of numerous other states, conceivably totaling 50 states, to adjudication of the rights of the proposed class members, Georgine v. Amchem Products, Inc., 83 F. 3d 610, 617-618 629-630 (3d Cir.1996), aff'd. 521 U.S. 591, 117 S.Ct. 2231, 138 L. Ed.2d 689 (1997); In re Ignition Switch No. II, supra., 194 F.R.D. at 496; Lyon v. Caterpillar, Inc., supra. 194 F.R.D. at 221; Chin v. Chrysler Corporation, supra., 182 F.R.D. at 460-461; In re Ignition Switch No. I, supra., 174 F.R.D. at 351.
2. Superiority
The second prong of the plaintiff's burden of proof under R.4:32-1(b)(3) is that the class action be "superior to other available methods for the fair and efficient adjudication of the controversy." The term "superior" was defined by the court in In re Cadillac, supra., 93 N.J. at 436, 461 A.2d 736 as follows:
By definition, "superior" implies a comparison with alternative procedures such as a test case or joinder of claims. Katz v. Carte Blanche Corp., 496 F.2d 747 (3d Cir.1974). That comparison requires: "(1) an informed consideration of alternative available methods of adjudication of each issue, (2) a comparison of *992 the fairness to all whose interests may be involved between such alternative methods and a class action and (3) a comparison of efficiency of adjudication of each method." Id. at 757.
Because of the complexity and management problems which would be confronted by the need to apply the law of conceivably up to 50 states and the need to resolve the numerous factual issues generated for individual members of the class depending upon their state of residence, plaintiffs have been unable to satisfy the superiority condition for class action certification. Similar conclusions have been reached by other courts. Castano v. American Tobacco Company, supra., 84 F.3d at 749-750; In re Ignition Switch No. I, supra., 174 F.R.D. at 351-354; In re Ignition Switch No.II, supra., 194 F.R.D. at 496; Chin v. Chrysler Corporation, supra, 182 F.R.D. at 462-465; Lyon v. Caterpillar, supra., 194 F.R.D. at 222-223.
Where plaintiffs are unable to meet the superiority test, one alternative suggested by our courts is the use of a "test case" to resolve common questions of fact and law, with the doctrine of collateral estoppel being applied against defendant in favor of plaintiffs' class members to the extent plaintiffs prevailed on any such common issue. In re Cadillac, supra., 93 N.J. at 436, 461 A.2d 736, (relying on Katz v. Carte Blanche Corp., 496 F.2d 747 (3d Cir.1974), cert. den. 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974), and Kronisch v. Howard Savings Inst., 143 N.J.Super. 423, 363 A.2d 376, (App.Div.1976)); Saldana v. City of Camden, supra., 252 N.J.Super. at 200, 599 A.2d 582, This is a remedy which plaintiffs could request, if their claim survives a motion to dismiss under Missouri law.
Another court has suggested that the proposed nationwide class sought by plaintiff be reduced to a class comprising only New Jersey residents. In re Ignition Switch No. I, supra., 174 F.R.D. at 352-353. However, plaintiff not being a New Jersey resident would still have to pass the tests of numerosity and typicality as applied to any New Jersey class member. Since those issues have not been briefed under circumstances involving such a narrowing of the class, nor have plaintiffs requested the court to consider so narrowing the class, this court does not decide the issue at this time. Moreover, there is no information at this time that there are a sufficient number of New Jersey residents, for whose benefit such a class would be created, who wish to assert claims against Ricoh that its advertising campaign to promote sale of the RDC-1 camera violated the NJCFA or that any loss was suffered as a result thereof, an element of proof which this court deems imperative to the creation of such a class.
Another court has suggested that individual trials would be superior to class action litigation where the law of numerous states must be applied to properly adjudicate the claims of the various class members. Castano v. American Tobacco Company, supra, 84 F.3d at 749-750, where the court held:
The complexity of the choice of law inquiry also makes individual adjudication superior to class treatment. The plaintiffs have asserted eight theories of liability from every state. Prior to certification, the district court must determine whether variations in state law defeat predominance. While the task may not be impossible, its complexity certainly makes individual trials a more attractive alternative and, ipso facto, renders class treatment not superior.
In view of the lack of proof that claimants other than plaintiffs desire to assert a loss caused by the violation of the consumer fraud laws of any state other than Missouri, *993 the Castano approach to resolution of the dispute through individual trials lacks any basis for consideration based on the current state of the proofs.
For the forgoing reasons, plaintiffs' motion to certify a nationwide class is hereby denied.
NOTES
[1] For example, the Unfair Trade Practices and Consumer Protection Law of Pennsylvania requires pleading and proof of reliance. Pa Stat. Ann. § 73:201-4; Weinberg v. Sun Company, Inc., 618, 565 Pa. 612, 777 A.2d 442, 446 (2001); Rizzo v. Michener, 401 Pa.Super. 47, 584 A.2d 973, 980 (1990). Other states also require proof of reliance in order to support a consumer fraud claim. See, e.g. Occidental Land, Inc. v. Superior Court (Fahnestock), 18 Cal.3d 355, 134 Cal. Rptr. 388, 556 P.2d 750, 754 (1976); Forbes v. Par Ten Group, Inc., 99 N.C.App. 587, 394 S.E.2d 643, 647 (1990); Dix v. Am. Bankers Life Assurance Co., 429 Mich. 410, 415 N.W.2d 206, 209 (1987).
[2] The reference to "Prb" to plaintiffs' reply brief in support of their motion for class certification.
[3] Plaintiff also cited DeLima v. Exxon Corp., No. A-3536-99TS (App.Div.2000), an unreported opinion involving a class action against Exxon Corporation for allegedly misrepresenting that its premium 93 octane gas kept engines cleaner, reduced maintenance cost and increased performance. The plaintiffs' theory in DeLima of a "price inflation theory of causation" was supported by their expert Dr. Williams Latham, III, the same expert employed by plaintiff in the Weinberg and Oliveira cases. The Appellate Division followed the opinions of the Pennsylvania and Illinois intermediate appellate courts in Weinberg and Oliveira cases, respectively, in allowing the "price inflation theory" of damages proximately caused by defendant's allegedly false advertising. However, that precedential basis no longer supports the DeLima opinion because of the reversals of both cases by the Supreme Courts of Pennsylvania and Illinois, respectively. Moreover, since the DeLima opinion is not reported, it is not binding upon this court and may not be used as precedent to support this court's opinion. R. 1:36-3. In addition, a letter order dated June 29, 2001 by Hon. Jack B. Kirsten, J.S.C. struck the Compendium of Unreported Cases submitted by the plaintiff, in response to defendant's letter application for such relief, as well as striking "those portions of the reply brief that rely on the Compendium." One of the cases included in the stricken Compendium is the DeLima opinion.
[4] The letters written by Joel Fink were prepared with the aid of his son Jason, a practicing Missouri attorney. Ricoh has accused plaintiffs of an ulterior motive in the litigation, arguing that Jason Fink is involved in the suit. At Oral Argument, plaintiff counsel, Seth Lesser, Esq., stated that Jason Fink is not involved in the case any longer. Further, Mr. Lesser represented that Fink's son will receive no counsel's fees if any are awarded. Therefore, the issue appears to be factually unsupported, at least at the present time.